STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
EDGAR SMITH, ALSO KNOWN AS EDGAR H. SMITH,
DEFENDANT-APPELLANT.

Argued June 2, 1958—Decided June 25, 1958.

434

*Mr. John E. Selser* and *Mr. Herbert L. Smith* argued the cause for appellant.

*Mr. Thomas S. O'Brien* argued the cause for the State (*Mr. Guy W. Calissi*, attorney; *Mr. William C. Brudnick*, on the brief).

The opinion of the court was delivered by

WACHENFELD, J. The defendant, Edgar Smith, having been convicted of first-degree murder without a recommendation by the jury, appeals the judgment of death rendered against him, contending he was denied a fair trial, that the verdict was against the weight of the evidence, and that prejudicial error was committed requiring a reversal of the conviction returned.

The points contended for by the defendant will be disposed of in the order in which they are presented in his brief.

The factual developments, although disputed in many respects, will be set forth fully since they have a direct relationship to some of the issues raised.

The victim, Victoria Zielinski, a 15-year-old school girl, resided in Ramsey, Bergen County, New Jersey. At about 7:30 P. M. on March 4, 1957 she left her home, intending to walk to the house of her friend, Barbara Nixon, located on the same street, Wyckoff Avenue, about eight-tenths of a mile away. She was accompanied by her 13-year-old sister, Myrna. Myrna left her sister about two houses away from her destination and returned home alone. The two girls had arranged that at 8:30 P. M. Victoria would leave the Nixon house and Myrna would leave her own home and they would meet half-way on Wyckoff Avenue and walk home together.

Myrna started toward the Nixon home at 8:40 but did not meet her sister as planned. She went to the Nixon home, arriving there at about 8:50, and ascertained that Victoria had left there at about 8:30. Barbara Nixon had accompanied Victoria outside and had seen her walking toward her home. Barbara had lent her a gray scarf, and she testified that

when Victoria left for home no cars were seen passing on Wyckoff Avenue in either direction.

While Myrna was returning home at about 9:05 or 9:10 P. M. she saw a boy, designated as D. H. for the purposes of this opinion, drive past going in the direction of Ramsey at 50 or 60 miles an hour. He was alone in the car. Myrna testified that D. H. had known Victoria but had never dated her. At the trial D. H. admitted he had taken Victoria out approximately ten times.

When Myrna arrived home at about 9:10 P. M., she informed her mother, Mrs. Mary Zielinski, that Victoria had not met her as planned. Mrs. Zielinski was not unduly disturbed and took no immediate action. When Victoria had not appeared by 12:30 A. M., however, Mrs. Zielinski awakened her husband, Anthony, who had retired at 8:00 P. M. and told him the girl was missing. Mr. Zielinski got up, dressed, and with his oldest daughter, Mary, went out to look for Victoria.

While driving down Wyckoff Avenue, Mr. Zielinski and Mary encountered a patrol car and talked to the policemen who were in it. They then went on to a milk bar in Ramsey but were unsuccessful in finding Victoria, returning home about 1:00 A. M. Shortly thereafter Mr. Zielinski and his wife went out to continue the search, driving past the Nixons' and going to another milk bar. After about an hour the elder Zielinskis repaired to their home, and there continued their vigil until daybreak.

As soon as it was light Mr. and Mrs. Zielinski resumed their search for their daughter. They visited the Nixons, who reported they had not seen Victoria since she left their home on the previous evening. They then went downtown and gave Victoria's picture to a Ramsey police officer. Afterwards, the Zielinskis cruised around the streets in the vicinity of Wyckoff Avenue.

At about 9:00 A. M. Mr. Zielinski noticed a black loafer lying in the street near the intersection of Fardale Avenue and Chapel Road. As he stopped his car he also noticed a kerchief, or babushka, approximately 20 feet farther up

the road. It was stained with blood. He immediately dispatched his wife for the police, and then clambered over a low wall on the right-hand side of the road and began to search through the underbrush beyond. Finding nothing there, he went to the entrance of a sand pit situated just beyond the intersection of Fardale and Chapel, where he discovered a pair of red gloves. He returned to his automobile.

By this time Captain Wickham of the Mahwah Police Department had arrived on the scene, and together he and Mr. Zielinski searched both sides of the dirt road leading into the sand pit. There were tire tracks on the road. When they reached the top of a mound of dirt beyond the end of the dirt road Mr. Zielinski discovered a silver locket belonging to Victoria, her other loafer, various footprints, stones covered with blood, and an area of ground which had been "scuffed." He then saw "brains scattered for seven or eight feet along the bank." He looked over the edge of the mound and saw her body "in a jackknifed position."

Victoria was lying face down with her sweater pulled up around her neck and her brassiere down around her midriff. One of its straps was broken. She was still wearing dungarees. One of her socks was completely off while the other was hanging on her foot. Her windbreaker was lying beside her. There was a hole in the back of her head and much of her hair was gone. A hank of hair matted with blood was subsequently found on Fardale Avenue near the loafer first discovered by Mr. Zielinski. At the trial, Mrs. Zielinski, Myrna Zielinski and Barbara Nixon identified the clothing and accessories found on or near Victoria's body as those she had worn before she disappeared.

The autopsical examination revealed the cause of death as "the total crushing of the skull with a decerebration, traumatic." Victoria's brain and left eye were completely destroyed. Her teeth were hanging loosely in her mouth and her nose and jaw had sustained multiple fractures. Both her hands were covered with blood, and her fingernails were ripped. There was no evidence of a carnal assault. There

were no marks on her body from the neck down, save for four or five small bruises on her right breast, apparently teethmarks.

Because the weather had been below freezing the county medical examiner was unable to fix precisely the time of death, stating "the time of death in the winter with *rigor mortis* is a very moot problem" and "[t]he prevailing weather has a great deal to do with the setting in of *rigor mortis* or the dissolution, and I estimate that she was dead about 12 hours, give and take an hour." Since the autopsy had taken place at about 1:00 P. M. on March 5, this estimate placed the time of death at around 12:30 or 1:00 A. M. on March 5. On cross-examination the medical examiner emphasized, however, that the exact time of death could not be fixed and further clarified his findings by stating:

"Q. So it was [the time of death], in your judgment, not * * * earlier than 11 o'clock * * * or perhaps not later than one? A. It could have been earlier than 11 o'clock because the prevailing weather was so cold and the body might have stiffened up, according to standard data.

With *rigor mortis* setting in in the normal way and the normal atmosphere and the normal temperature, the time of death would be established at 12 hours, either an hour later or an hour earlier, but with the prevailing weather being as cold as it was, it was very hard to determine when it was exactly."

The defendant, Smith, was 23 years of age with a wife and family. Prior to the date of the murder he had been employed at various jobs for short periods of time. His last employment was with a seat cover and automobile muffler shop which had hired him to help install hydraulic lifts and other equipment in its garage. Smith was discharged from this job on March 4, 1957, after working for approximately a week.

Defendant's possible connection with the murder was brought to the attention of the police by Joseph Gilroy, a friend of Smith, who testified as to what caused his suspicions.

On March 4, 1957 Smith telephoned Gilroy from the Paramus Bowling Alleys on Route 17 and requested him to drive over. Gilroy arrived at the alleys at approximately

4:30 P. M. and bowled four or five games with Smith and another friend, Charles Rockefeller. All three left the alleys at about 6:30 P. M. in Gilroy's automobile, a 1950 Mercury convertible. While journeying home Smith asked Gilroy if he could borrow the latter's car in order to procure some kerosene for the heater in the trailer where Smith lived with his wife and baby. Gilroy consented, and Smith took the automobile after dropping off Gilroy and Rockefeller at their respective homes.

Around 9:15 P. M. Smith telephoned Gilroy at his home. He said he was sick and had been unable to light the heater and asked Gilroy to drive him and his family to his mother-in-law's residence in Ridgewood. Gilroy agreed, and Smith came by for him in the Mercury at about 9:45 P. M. The two men then drove to the trailer to get Smith's wife and child.

On the way to the trailer Smith volunteered the information that he had vomited on the trousers he had been wearing earlier and had had to dispose of them, not saying where. Gilroy stated that in his opinion Smith did not look ill at the time.

After picking up Smith's family Gilroy drove them to Ridgewood and then returned home. At about 12:00 noon on the succeeding day, March 5, Smith again telephoned Gilroy, this time asking him to drive the Smiths from Ridgewood back to the trailer. Gilroy acquiesced and thereupon drove to a gas station, where he encountered D. H. The two drove to Ridgewood in D. H.'s car.

During the journey D. H. and Gilroy talked about the murder. D. H., who, from a conversation at the gas station, knew that Smith had borrowed Gilroy's automobile on the preceding night, told Gilroy he was "going to tell Eddie that the police are looking for a Mercury." Apparently, this was regarded as a joke. Gilroy testified that actually D. H. "didn't know if the police were looking for a Mercury." When Smith emerged from his mother-in-law's home, D. H. "winked" at Gilroy and then told Smith the police had discovered "tire prints" and were "going to check all the

Mercurys in Bergen County." Gilroy testified that Smith reacted with "a startled look on his face."

While driving to the trailer the occupants of D. H.'s automobile discussed the murder, D. H. stating he had driven past Myrna Zielinski on Wyckoff Avenue the previous evening. Either Smith or his wife picked up a lipstick from the floor of D.H.'s car and handed it to D. H., saying "Maybe this is Vickie's lipstick." D. H. replied "No" and threw it out the window.

When the party arrived at defendant's trailer Smith got out of the car and returned with a pair of shoes which he placed in the back. D. H., Gilroy and Smith then drove downtown, where Smith left the other two, saying he was going to get a cup of coffee. He took the shoes but did not have them with him when he later rejoined D. H. and Gilroy.

Some time later Gilroy noted stains on the driver's seat and floor mat of his car. He habitually carried baseball equipment in the car and a bat was missing from the back seat. This bat was subsequently discovered in the woods near the intersection of Fardale and Chapel. It was ingrained with blood. The presence of the stains, conjoined with Smith's behavior concerning the trousers and the shoes, sharpened Gilroy's suspicions. He showed the stains to D. H., Rockefeller and another friend, and, upon their advice, went to the Ramsey police.

Acting on the information supplied by Gilroy, at about 11:30 P. M. on March 5 Detective Graber and other officers went to Ridgewood and took Smith into custody at his mother-in-law's home. Smith was removed to the Mahwah police headquarters and there interrogated. Subsequently, he accompanied the police to Ramsey, where his shoes were retrieved from a garbage pail. Both shoes were liberally impregnated with human blood and proved to be exact duplicates of plaster impressions taken of footprints at the scene of the crime. The tongue of one and part of the soles of both were missing.

Later, Smith was taken to the sand pit where, at around 7:40 P. M. on the previous night, he claimed to have pulled

just a short way into the dirt road in order to "throw up."
No evidence of vomit was found. Smith refused to walk
over to the place where the body had lain, saying "he did
not know what was over there" and "had never been back in
that vicinity." He told the police he had thrown away his
trousers in a certain area along Pulis Avenue after vomiting
on them, but a search for the trousers was fruitless. In
addition to combing the Pulis Avenue vicinity, the police also
looked along Wyckoff Avenue where Smith claimed to have
vomited before entering the sand pit. Again, nothing was
found. The jacket Smith had been wearing on the night of
March 4 was recovered from his mother-in-law's home, but
according to the testimony of Detective Graber, the defendant
said it "would not do us much good" since defendant had
already washed it.

Captain DeMarco of the Bergen County Prosecutor's office
testified he had examined Smith's hands and legs during the
course of the initial interrogation at Mahwah Police Head-
quarters and had discovered that defendant's hand and one
knee were lacerated while his other knee displayed a recent
contusion. Smith claimed to have injured his hand while
repairing an automobile tailpipe and said the knee injuries
had resulted from his falling out of Gilroy's car on the night
of March 4 when he vomited on Wyckoff Avenue. Captain
DeMarco also related that Smith told his interrogators, "If
you are looking for a fall guy, why don't you grab D. H.?"

After his trip to the sand pit in the company of the officers
Smith was taken to the prosecutor's office and questioned
further by Detective DeLisle, who testified that the defendant
broke down and started to cry at about 10:00 A. M. on March
6, requesting permission to see a priest. After a slight interval
Smith regained his composure and then admitted driving
Victoria Zielinski to the sand pit in Gilroy's automobile on
the night of March 4. He stated the girl had "babbled"
something about "school and a note" and had gotten extremely
excited and attempted to leave the car, whereupon he, Smith,
had hit her "a good shot." The questioning was interrupted
while Smith talked with the priest whom he had asked to

see. Then the defendant gave a lengthy statement under oath in which he related in some detail his activities on the day of March 4. Subsequently, Smith, on the advice of his attorney, refused to sign this statement, but he conceded its accuracy. It was admitted into evidence at the trial. The officers who were present and the stenographer who recorded the statement testified the defendant gave it calmly and voluntarily. Smith began his statement in the prosecutor's office and continued making it as he and the police revisited the vicinity of the crime. The substance of Smith's admissions follows.

On the morning of March 4, 1957 he was laid off from his job. He spent most of the afternoon at a bowling alley in Paramus and left for his trailer home at about 6:30 P. M. with Gilroy and Rockefeller. He borrowed Gilroy's car and drove to a gas station where he purchased five gallons of kerosene. He returned home shortly before 8:00 P. M. and tried to light his heater but was unsuccessful. He decided that he needed more kerosene. Before he drove off, his wife returned from the doctor's accompanied by her mother. Smith informed them of his errand and left. He bought five more gallons of kerosene at a Ramsey service station and started to return home via Wyckoff Avenue at about 8:30 P. M.

Near Fardale Avenue in Mahwah he saw Victoria Zielinski, whom he knew casually "from meeting her in town," walking along the street. He was proceeding in the opposite direction and was going to pass her by, but she yelled or motioned for him to stop. He turned around and came back and she requested a ride to her home. Smith had driven her home on several previous occasions, and he agreed. The time was approximately 8:35 P. M.

Shortly before they reached the Zielinski residence Victoria told Smith that her sister was walking to meet her and that she did not want Myrna to see her in the car with him because "she was in trouble with her family." She asked him to drive around the block. He complied, turning off Wyckoff Avenue onto West Crescent Avenue, the last street before her house. When they arrived at the sand pit off Chapel Road

near Fardale, he turned in of his own accord. Defendant and the victim sat in the car and talked as Smith smoked a cigarette.

Victoria told him she was having difficulty with her family over cutting school and that they had found out about a false note she had prepared and sent to the school under her mother's name. Suddenly, and according to Smith for no apparent reason, she said: "I am going to get out and walk home. I am going to tell my father. I am going to go home and tell him you are like the rest of the guys."

She started to leave the car. Smith, feeling he was responsible for seeing her home, reached across the seat and grabbed her arm. She struggled and got part of the way out of the car as he worked his way across to the passenger's side of the front seat. When he tried to follow her out, she "started yelling something" and "swinging at me and sort of slapping." He swung in her direction with his right arm, "a fist or a slap," but could not remember whether or not he hit her. "The next thing I actually realized was getting back into the car."

Defendant stated his recollection of the events succeeding the struggle was "vague"; "[t]hat's where somebody pulled the switch." He was unable to recall whether or not he had struck Victoria more than once or with something other than his fist. He had "a feeling of running somewhere," of "chasing somebody." The ground was "soft." He said: "I think I recollect running in the sand with my shoe off."

Smith was alone when he got back into the car and his right foot was cold. Later, he realized he had lost his shoe. He backed the automobile onto Chapel Road and after proceeding 40 or 50 yards stopped by the edge of a wooded area where he remembered seeing a Christmas tree he had thrown away there. Victoria's school books and pocketbook were in the car when he left the sand pit but not there when he arrived home. He thought he had probably thrown the books and the pocketbook into the woods near the Christmas tree. When he arrived home Smith realized for the first time that his trousers and socks were bloody. He told his wife he had

been sick. She gave him a clean pair of pants. He threw the bloody socks onto a patio outside the trailer. Once again, he tried to light the kerosene heater and failed. He telephoned Gilroy and asked the latter to drive him and his family to Ridgewood. He went alone to pick up Gilroy and took the bloody trousers and a "twelve volt lantern" with him.

Before going to Gilroy's home Smith returned to the sand pit. Utilizing the lantern, he found his other shoe. He also saw a red mitten or glove but "didn't think anything of it" and kicked it off to one side. Between the sand pit and Gilroy's he disposed of the bloody trousers, but could not remember how. By the time he reached Gilroy's home he had "completely forgotten about the whole thing * * * [j]ust like it never happened."

When he and Gilroy arrived back at the trailer, Smith placed the shoe he had recovered from the sand pit in the bedroom with its mate. He and his family were then driven to Ridgewood by Gilroy. Smith "watched the end of the television show," "washed up," and went to bed at about 10:00 p. m. He "never realized anything was wrong at all."

The next morning he got up and washed the shirt and jacket he had been wearing on the previous night. Around 11:30 a. m. he heard a news broadcast reporting Victoria's death. He began to get "curious": "Something was snapping in the back of my head." Early that afternoon he discussed the homicide with Gilroy over the telephone, and "[t]hat's when it dawned on me that I had been with her the night before and something snapped in the back of my head that I did it and I knew it in the back of my head [but] I couldn't convince myself." Later, when D. H. told him the police were checking Mercury registrations, "[t]hat's when it hit me really hard I must have been the one who really did it." Subsequently, as already described, defendant placed his shoes in a garbage pail from which they were removed by the police.

Smith told his interrogators he had been "cold sober" on the night of the 4th, but that after he had swung at Victoria "[t]hings turned sort of red and then black." He estimated

he had spent 10 to 15 minutes in the sand pit the first time and said that the wounds on his hand and knees must have been inflicted during the interval between the time when his memory went blank and the next morning. He could not recall precisely how he had sustained them. He denied making any advances to Victoria.

Smith's trousers with two socks stuffed into the pockets were located by the police. Both the socks and khakis were stained with type "O" human blood, the same type found on the victim's sweater, jacket, brassiere, gloves and scarf. Smith's blood type is "A." Following Smith's directions, the officers recovered Victoria's handbag and school books. Defendant identified the shoes, trousers, socks, jacket and wool shirt as the clothes he had been wearing on the night of the crime.

While engaged in making his statement, Smith was asked whether he had been mistreated and replied, "No," saying his treatment had been "[b]etter than expected."

Testifying on his own behalf at the trial, Smith materially changed his version of what had occurred on the night of March 4. He stated Victoria, not he, had suggested that they park in the sand pit so that she could discuss something important with him. After they had parked, she told him his wife was running around with another man. He was greatly upset and slapped her face, telling her to get out of the car. She left and started walking down the road.

A few moments thereafter, while he was preparing to leave the pit, defendant heard a commotion and saw two figures coming up the road. He quickly got out of the car and his "bad" ankle, which had been struck by a bowling ball earlier in the day, collapsed under him, his right shoe coming off. Since the identities of the oncoming persons were unknown and it was a lonely spot, he seized the baseball bat from the back seat of the car for protection.

As the figures approached, he recognized them as Victoria and D. H. Victoria was bleeding from a cut over her ear. Smith asked D. H. what had happened, and the latter replied the girl had fallen on the road. Smith examined the wound

and in the process got blood on his hands and trousers. Feeling she should be taken to a doctor, he placed her in the automobile, but D. H. grabbed her and forcibly pulled her out, telling Smith to leave her alone, that he, D. H., would take care of her. Victoria pleaded with Smith for succor, but since D. H. knew her much better than he, Smith decided he should not interfere further and drove off, leaving his shoe and the baseball bat behind.

When he returned to the sand pit later that evening, while on his way to Gilroy's, defendant saw the baseball bat and noted it had been split but did not pick it up. He also noticed the red glove.

Before reaching Gilroy's home, Smith encountered D. H., who was parked on Main Street in Ramsey. Smith stopped and inquired how Victoria was, and D. H. told him: "Don't worry about her, forget about her. Don't say anything about tonight or we will all be in trouble. * * * If you mention my name or use my name in this, I'm going to get your wife and baby." Smith was puzzled as to why this threat was made.

The next day he took his shoes to a shoemaker for repair, but upon being informed that they were not worth fixing, threw them into the garbage pail where the police later found them. With respect to the scratches and contusions on his knees, he testified he had injured himself when he fell while trying to pour kerosene into the heater in his trailer. When confronted on cross-examination by the discrepancies between his earlier statement and his trial testimony, Smith persistently maintained he had falsified the statement in order to avoid implicating D. H. in the crime since the latter had threatened Smith's wife and child. He admitted, however, that during his first interrogation at the Mahwah police headquarters he had told the officers to get D. H. if they wanted a "fall guy."

Smith's main defense, in substance was that D. H., not he, was the murderer. Both D. H. and the pharmacist in the drug store where he was employed testified, however, that the former had worked at his employment from 6:00 P. M.

to 9:00 P. M. on the night in question. D. H. had been dispatched on an errand at 8:35 P. M. but returned just before nine with the package he had been sent to pick up. D. H. stated that after leaving work at nine or shortly thereafter he went immediately to a tavern in Mahwah and thence to a milk bar on Route 17. His testimony was corroborated as to times and places by four other witnesses. D. H. denied having seen either Smith or Victoria on the night of March 4 and also stated he had not gone to the sand pit on the occasion in question. There was no proof to the contrary except Smith's testimony.

Defendant was convicted of first degree murder without recommendation, and the mandatory death sentence followed.

## POINT I

The trial court, it is said, committed prejudicial error by sanctioning the admission of Exhibits S–34, S–41, S–43, S–44 and S–45 over objection. They are colored transparencies, except S–34 and S–45, which are enlarged prints of S–44 and S–31.

It is contended there was not a proper foundation justifying their admission. The record conclusively shows the contrary. Ample evidence appears that the pictures "truly and accurately represent the scene around the body and all the circumstances at the time. * * *"

Photographs, of course, must be proved to be faithful representations of the subject at the time in question and are admitted into evidence as an aid to the jury in making its factual determination. Fundamentally, photographs are deemed to be pictorial communications of a qualified witness.

Enlargements as well as colored photographs, within proper limitations, are admissible in the discretion of the trial court. *State v. Bucanis,* 26 *N. J.* 45 (1958); *State v. Wise,* 19 *N. J.* 59 (1955); *State v. Huff,* 14 *N. J.* 240 (1954).

The photographer testified: "The color might be slightly exaggerated to the red side, but this is exactly what I saw." Therefore, it is urged some of the pictures were prejudicial because of the distortion or exaggeration of the redness of

the color of the bloody area depicted by them. We find nothing from the record or our examination of the pictures themselves warranting such a conclusion.

Many of our decisions have determined that photographs, despite their inflammatory nature, are nevertheless admissible if they are probative of some material fact. *State v. Wise, supra; State v. Huff, supra; State v. Meyers,* 7 *N. J.* 465 (1951); *State v. Heathcoat,* 119 *N. J. L.* 33 (*E. & A.* 1937); *State v. Burrell,* 112 *N. J. L.* 330 (*E. & A.* 1933); *State v. Fine,* 110 *N. J. L.* 67 (*E. & A.* 1932); *State v. Aeschbach,* 107 *N. J. L.* 433 (*E. & A.* 1931); *State v. Fiore,* 94 *N. J. L.* 477 (*E. & A.* 1920).

The probative force, however, is not always completely determinative of the admissibility of the exhibits. There are cases where the logical relevance of such exhibits might well be overwhelmed by their inherently prejudicial qualities, which would impair the defendant's right to a fair and impartial trial. When this occurs, they of course should not be admitted. *State v. Bucanis, supra.*

In the case *sub judice,* however, the pictures do not come within this classification, but rather within the rule as we have already pronounced it many times that "[p]hotographs of unpleasant and gruesome aspects of a murder case are not objectionable for this reason alone. * * *" *State v. Huff, supra,* 14 *N. J.* at *page* 251.

## POINT II

Did the court's charge to the jury accurately state the law or was it erroneous, resulting in manifest injury to the defendant in the following respects:

(a) Improperly stated the law as to the length of time involved in deliberation and premeditation;

(b) Failed to properly inform the jury that lack of evidence might be taken into account in determining whether reasonable doubt existed as to defendant's guilt;

(c) Did not properly distinguish between first and second degree murder;

(d) Limited the jury's consideration of the element of "time of killing" to credibility and to the testimony of one of the State's witnesses only.

(a)

■ It is said a portion of the charge in reference to premeditation and deliberation "was not only incorrect, but confusing." This assertion is based upon the supposition that the charge left the jury with the belief that, with respect to premeditation and deliberation, no time need intervene between the formation of the purpose to kill and its execution. The criticized portion is: "* * * but no length of time need intervene * * *." Defendant insists the trial judge committed reversible error by omitting the word "particular" between "no" and "length."

This position is only tenable if an isolated sentence of the charge is permitted to be construed out of context and unconnected with what preceded and followed. We have frequently decided this cannot be done.

"In determining whether or not error was committed, a single sentence may not be extracted and construed without regard to the context of the entire charge. * * *. The court cannot state the law of the case in a single sentence and the charge must be read as a whole in the light of a sensible construction to determine its legal worth. * * * Although certain sentences in a charge taken alone may neeed some amplification to render them accurate, yet if such amplification be given in the context so that the jury cannot be misled, there is no error justifying reversal. * * *" *State v. Tansimore,* 3 *N. J.* 516, 525 (1950).

See, also, *State v. Kollarik,* 22 *N. J.* 558, 566 (1956) ; *State v. Janiec,* 11 *N. J.* 397, 401 (1953) ; *State v. Goodman,* 9 *N. J.* 569, 588 (1952) ; *State v. Bunk,* 4 *N. J.* 461, 473–474 (1950) ; *State v. Fuersten,* 103 *N. J. L.* 383, 386–387 (*E. & A.* 1926) ; *State v. Sage,* 99 *N. J. L.* 229, 233–235 (*E. & A.* 1923).

Following the isolated sentence complained of in which the word "particular" was not used, the court charged :

"\* \* \* It is not necessary that deliberation and premeditation should continue for an hour or a minute. It is enough to satisfy the element of deliberation and premeditation that the design to kill be conceived and purposefully executed. If the time intervening for deliberation and premeditation is sufficient, fully and clearly to conceive the design to kill and purposely and deliberately execute [it], the requirements of these elements are satisfied."

The court further clarified the necessity of the time element by using a negative approach in saying:

"One who forms in his mind an intent to kill and who instantly carries out such intent in a flash without any thought or consideration whatsoever, is not guilty of murder in the first degree, because in such a case the elements of deliberation and premeditation are lacking."

Again the court charged:

"\* \* \* then you determine from the facts you find and according to the law as charged whether the murderous act, the killing, the bashing and crushing of her head, the braining that caused her death were committed with intent to take her life, to kill her willfully, deliberately, with premeditation, with full knowledge of the consequences with some time to think it all out in advance of the execution of the acts."

There is little substance to defendant's claim. The full import of the charge taken in context shows clearly the jury was informed that there must be an interval of time, however small, between the formation of the intent to kill and its execution. Such is our law. *State v. Sage, supra,* presents facts almost identical to those *sub judice,* and it is controlling.

(b)

Although the defendant admits the court charged,

"If from the evidence adduced or from the lack of evidence there is reasonable doubt remaining the accused is entitled to the benefit of it by an acquittal,"

he contends this instruction was inconsistent with, and practically nullified by, another portion in which the court charged:

"If you find after a consideration * * * of all of the evidence * * *, after consideration and deliberation of all of the evidence that the State has failed to prove beyond a reasonable doubt that the defendant dealt the mortal blows * * *, then your verdict shall be not guilty. * * *

* * * * * * * *

* * * Reasonable doubt is that state of the case which after the entire comparison and consideration of all the evidence leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge."

We cannot so conclude. One portion of the charge was an amplification of the other and, taken in conjunction, they clearly and correctly defined to the jury the obligation of the State and the rights of the defendant.

It is said: "These passages do not meet the standards of *State v. De Paola* [5 *N. J.* 1 (1950)]." Quite to the contrary, they do. In *De Paola* a request was made to charge concerning the lack of evidence and the fact that it could be taken into consideration by the jury. The court refused so to charge and we termed it error.

In the instant case, there was likewise a request to charge, defendant's request No. 16, but here there was no refusal to charge. The court not only charged the request submitted but adopted language similar to that employed by the defendant.

Furthermore, the court, for the benefit of the defendant, instructed the jury:

"* * * As to the presumption of innocence. It is a principle of law that a person charged with crime is presumed to be innocent until proven guilty beyond a reasonable doubt; and this presumption of innocence abides with him through the trial so that therefore, when the jury go from the bar of the court to their room to deliberate, they enter that room with the presumption of innocence still protecting the accused unless and until each of the twelve jurors are satisfied beyond a reasonable doubt of his guilt."

Additionally, it was stated the burden of proof was upon the State to prove:

"* * * beyond a reasonable doubt every material, essential element of the offense and if upon such proof there be a reasonable doubt with regard to the guilt of the assault he is entitled to the benefit of that doubt. Such burden of proof remains upon the State throughout the whole case and never shifts to the defendant."

## (c)

██ The charge was harmfully defective, says the defendant, in that "it failed to properly distinguish between first and second degree murder. * * * It is not here asserted that as far as the court went, that second degree murder was improperly defined, but the error complained of is that the court did not instruct the jury that intent to kill was not of itself sufficient to raise second degree murder to first degree murder."

True, the intent to kill is not by itself sufficient to raise second degree murder to first degree murder, nor may a charge be susceptible of the interpretation that on a mere finding of such an intent the jury must return a verdict of guilt in the greater degree. *State v. Alexander*, 7 *N. J.* 585, 598–599 (1951).

The record indicates, however, that the trial court painstakingly instructed the jury step by step as to the elements necessary to find first degree murder and second degree murder. It outlined five factors which were to be considered. It instructed that the first three, killing, malice and unlawful act, by themselves constituted only second degree murder and:

"In order to make out a case of first degree murder, the fourth and fifth, or the two additional elements, must be each proved beyond a reasonable doubt.

Fourth, an intent to kill; the killing must be intentional, and fifth, the killing must be willful, deliberate and premeditated."

Again, the court charged:

"If you find there was no intent to take her life * * * that killing by death-dealing blows was not willful, deliberate and pre-

meditated, then your verdict shall be guilty of murder in the second degree. \* \* \* If you find \* \* \* that the murder was with intent to kill Vickie Zielinski, willful, deliberate and premeditated \* \* \* then your findings shall be murder in the first degree. \* \* \*"

The court's explanation of the differences between the elements necessary to constitute second degree murder and first degree murder was proper under our law. The trial judge plainly instructed the jury that intent, premeditation and deliberation were necessary to sustain the verdict of the higher degree.

### (d)

█ The defendant insists the court's charge with respect to time of death constituted prejudicial error in that it removed from the consideration of the jury the question of reasonable doubt which could have been engendered by the evidence as to the time of death and the non-presence of the defendant at that time.

He sharpens his thrust by asserting the instructions took away from the jury "one of the factual and most important issues at the trial. \* \* \*"

The record is otherwise. In a long, comprehensive charge the court, amongst other things in this respect, said:

"\* \* \* You make your own ultimate judgment of the facts of the case. You recollect yourself what the testimony was in any particular case as to any particular witness. It is your recollection of the testimony by which you are to be guided and not by my recollection or the recollection of either the State or the defendant's counsel."

Again it was charged:

"\* \* \* The time of the killing has been brought into evidence in this case to affect credibility, to affect proofs of the State. You have to consider all the evidence in respect to that testimony in determining that issue of what the doctor said as to the time of death and after he had testified that he concluded that the cause of death was due to a total crushing of the skull with a decerebration. \* \* \*"

The court then quoted at length from the testimony of the doctor who had performed the autopsy and had made the estimate as to the time of death, reviewing those portions where the witness had pointed out the difficulty encountered in this endeavor because of the cold weather and its effect upon the setting in of *rigor mortis,* the doctor finally concluding: "* * * but with the prevailing weather being as cold as it was, it was very hard to determine when it was exactly."

Following this, the court again charged:

"Now, you have to consider all the testimony and recollect the testimony in weighing and determining what the facts are, what the credible facts are, and that is an example of it. You cannot just take one piece or one statement or one question and answer from one witness out of context and say that he said so-and-so and so-and-so exactly and precisely. Weigh it all, consider it all and consider all the testimony in the case in making your determination on any of the points that you have to determine."

With the breadth of this charge and the emphasis made by the court, it is difficult to give credence to the accusation that it took anything away from the jury.

## POINT III

Was the polling of the jury improper and did it deny the defendant his right to an individual poll of each juror?

After the foreman announced the verdict as "guilty of murder in the first degree," the defendant requested a poll of the jury and the court directed it to be taken in the following manner:

"The jury will be polled. The verdict of the jury as announced by the Foreman and recorded by the Clerk, guilty of murder in the first degree, if that is your individual verdict and vote as a juror when your name is called by the Clerk you will answer yes. If that verdict guilty of murder in the first degree as announced by the Foreman as the verdict of the jury and recorded by the Clerk is or was not your verdict as a juror and your name is called you will answer no. Do you understand?"

The foreman replied, "Yes, sir," and the trial judge then directed the clerk to poll the jury. Each juror's name was called by the clerk and each, in answer to his name, said "Yes."

This, the defendant asserts, was contrary to *State v. Cleveland*, 6 *N. J.* 316 (1951), where we held that upon a poll it was the duty of each juror to indicate clearly whether he found the prisoner guilty of murder in the first or second degree, and the jurors in that case not having so expressed themselves, we reversed.

The *Cleveland* case, however, is readily distinguishable because there the degree of murder was not stated either in the question asked or in the answers of the individual jurors.

The instant case is parallel with *State v. Meyers, supra*, where the jurors answered variously "Yes," "Yes, sir," and "It is" to the question put by the clerk to each of them whether murder in the first degree with a recommendation of life imprisonment was their verdict. We held:

"* * * each [juror] expressly indicated that was his verdict. Each juror announced his finding of the defendant's guilt and specified the degree of murder. The right to a poll of the jury * * * was fully satisfied." (7 *N. J.* at *page* 484.)

In *State v. Huff, supra*, as here, after the verdict had been announced, the court said:

"Members of the jury, the court will record your verdict as rendered, guilty of murder in the first degree with recommendation for life imprisonment. The jury will be polled. As each juror's name is polled, if such juror agrees with the verdict recorded, will you kindly respond 'I do.' If you do not agree with the verdict as it is recorded, then kindly respond that you do not agree. The verdict as recorded is guilty of murder in the first degree, with recommendation of life imprisonment."

We approve this formula, saying at *page* 255 of 14 *N. J.*:

"This procedure is within our pronouncement in *State v. Meyers, supra*, and *State v. Vaszorich*, 13 *N. J.* 99 (1953)."

The manner and form of the recording of the verdict was in accord with our law as established by previous adjudications. *State v. Hunt,* 25 *N. J.* 514 (1958). *Cf. State v. Greely,* 11 *N. J.* 485 (1953).

## POINT IV

Was Exhibit S–84 erroneously admitted into evidence as a confession?

The admission of this exhibit was originally objected to by the defendant upon the ground that it was not a confession and therefore the writing itself, as opposed to verbal reports of Smith's statements to the police, was not admissible in evidence. This theory is not advanced in the brief presently before us. The only argument asserted now is that before he made the confession Smith had never been told of the nature of the injuries from which the victim died and that for this reason the inferences drawn from the confession are unjustified. In other words, counsel insists Smith may have confessed to killing Victoria only because he believed the punch or slap he had delivered soon after they arrived at the sand pit was the fatal blow.

This argument has no merit. Among other things, it assumes the truth of Smith's testimony that he did not learn what the cause of death had been until sometime around Easter of 1957. Smith, however, admitted he had read the story of the murder in a local newspaper on the afternoon of March 5, 1957, previous to making his confession on the morning of March 6. The State produced the March 5 edition of the paper in question at the trial. The second paragraph of the Zielinski murder story reveals that the girl's skull "had been crushed by a rock." When confronted with the newspaper, Smith offered the weak evasion that "I never take a newspaper to be accurate."

The jury had a right to conclude that defendant was fully cognizant of the cause of Victoria's death at the time he confessed.

Although we have difficulty conceiving the error upon which the defendant actually relies, we will treat the con-

fession as though its introduction had been opposed upon every conceivable legal ground.

The record clearly shows that on the lengthy argument in reference to the exhibit's admissibility the trial court agreed in part with counsel for the defendant, saying there was a difference between a mere statement containing admissions and a confession and that a stenographic transcript of admissions was secondary evidence, hearsay and not admissible. It then defined a confession thusly:

"Now, a confession, however, is a direct acknowledgment of guilt on the part of the accused and that is the différence between a confession and an admission, and a confession, though unsigned, if acknowledged, read and approved by the confessor, is admissible in evidence as an entity."

After analyzing and quoting a goodly portion of the statement made by the defendant, the court stressed the following paragraph:

"I went back in. That's when it dawned on me that I had been with her the night before and something snapped in the back of my head that I did it and I knew it in back of my head. I couldn't convince myself."

Again, defendant stated his friend told him, "The place up there is swarming with cops and checking the registration of every Mercury registered in Bergen County," and then:

"That's when it hit me really hard I must have been the one who really did it."

The court concluded:

"That in the opinion of the court constitutes a direct acknowledgment of guilt on the part of the accused sufficient in both these instances as admissions of guilt to constitute this document, together with all the other relations in it in respect to the happening, as a confession and, therefore, S–84 for identification is admitted in evidence, as a confession."

A confession made by a defendant need not be signed by him to make the document itself admissible. If it was read

over to the accused, or by him, if it was signed or otherwise admitted by him to be correct, it is admissible. *State v. Monahan,* 16 *N. J.* 83 (1954); *State v. Cleveland, supra; State v. Foulds,* 127 *N. J. L.* 336 (*E. & A.* 1941); *State v. Donato,* 106 *N. J. L.* 397 (*E. & A.* 1930); *State v. Lustberg,* 11 *N. J. Misc.* 51 (*Sup. Ct.* 1933); Admissibility in evidence of unsigned confession, 23 *A. L. R. 2d* 919.

In *State v. Donato, supra,* 106 *N. J. L.* at *pages* 407–408, deciding an almost identical question, our Court of Errors and Appeals said:

"* * * But the undoubted rule is that a confession of the accused which was reduced to writing by another person and was read over to or by the accused, and which was signed or otherwise admitted by him to be correct, is as much his written confession as one prepared entirely by his own hand would be; and when made voluntarily it is admissible against him. * * * And where, as here, a confession of the accused, made voluntarily, which was reduced to writing by another person, but which the defendant refused to sign, when it was presented to him for that purpose, 'until he sees his counsel' or 'on the advice of counsel,' and for no other reason, it was not prejudicial error to admit such written confession, it appearing that the writing was clearly proved, before its admission in evidence, to be entirely accurate, with no evidence—not even a suggestion—that there was any inaccuracy in the writing, although the accused was accorded ample opportunity to make such showing if he could. * * *"

In the same case, the court defined a confession, saying:

"'Confessions' are admissions, made at any time by a person accused of crime, stating or suggesting the inference that he committed or participated in the commission of that crime. * * * Such are the statements in question." (106 *N. J. L.* at *page* 407)

The statement in the case *sub judice,* in our opinion, was a confession in which the defendant, at least in part, admitted committing the crime charged against him.

Concededly it was voluntary, although the defendant at the trial said he had given untruthful answers.

Whether a statement or confession is voluntary depends upon the facts in each case. The determination of the trial court will not as a rule be disturbed on appeal when there

is sufficient evidence to support it. *State v. Pierce,* 4 *N. J.* 252 (1950); *State v. Cole,* 136 *N. J. L.* 606 (*E. & A.*), *certiorari* denied 334 *U. S.* 851, 68 *S. Ct.* 1503, 92 *L. Ed.* 1773 (1948).

We see no error in the admission of the questioned exhibit.

## POINT V

Was the jury's verdict the result of prejudice, passion or mistake and not founded upon proven facts?

 During the presentation of this argument, the defendant points to certain comments made by the prosecutor during summation and describes them as "other reasons for this mistake, passion or prejudice."

It is not contended we should reverse the conviction simply because the prosecutor's remarks exceeded the bounds of fair play, but it is suggested they be treated as factors which possibly influenced the jury to return a verdict which actually was against the weight of the evidence.

Despite this indirect approach, we have nevertheless completely reviewed the prosecutor's comments and his whole summation and the court's charge to determine whether prejudicial error was committed.

Generally, a prosecutor is limited to commenting upon the evidence and the reasonable inferences to be drawn therefrom. *State v. Bogen,* 13 *N. J.* 137 (1953). But this does not mean that he is precluded from making a vigorous and forceful presentation of the State's case, couched in trenchant terms, and, as said in *State v. Vaszorich,* 13 *N. J.* 99, 119 (1953), "every excursion outside the evidence will not necessarily vitiate a conviction and * * * on the question whether the improper comment shall have that effect, the making by trial counsel of a timely and proper objection and the action of the trial judge in connection therewith are ordinarily controlling considerations." See *State v. Hauptmann,* 115 *N. J. L.* 412 (*E. & A.*), *certiorari* denied 296 *U. S.* 649, 56 *S. Ct.* 310, 80 *L. Ed.* 461 (1935); *State v. Terry,* 91 *N. J. L.* 539 (*E. & A.* 1918).

Although numerous remarks of the prosecutor are now called to our attention and claimed to have been prejudicial, the record shows that only one was objected to, in a somewhat subdued manner, at the trial. The prosecutor said:

"The people of this county are looking to this jury. Shall the teenagers of this county, the school girls of this county walk the streets without fear?

Mr. Selser: Of course, if your Honor please, this is a very unhappy moment.

Mr. Calissi: You can object if you want.

Mr. Selser: I think it is unfair comment and I ask counsel be instructed not to pursue it and your Honor instruct the jury not to consider it.

The Court: Let us keep the whole case within the confines of this room and this evidence."

Following this, the prosecutor continued:

"I again repeat to you that the eyes of Bergen County, especially, are now on this jury. I ask you to do your sworn duty."

But no further reference was made to "teenagers" and to "school girls," the mention of whom apparently caused defendant's objection.

In its charge, the court specifically instructed the jury as follows:

"Remarks of counsel in the course of trial outside the scope of the evidence, in the argument of points of law or evidence with the Court in the presence of the jury, or in summation, as the remark of the Prosecutor, 'The eyes of Bergen County are upon you,' have no place in the trial and shall not be considered by the jury in their consideration and deliberations. You are to determine the issue solely on the evidence in the case and the law as the Court charges it, with no consideration at all as to whose eyes are upon you. It is the eyes of your own conscience that you make a proper judgment according to your oath without any consideration of who else is concerned but the parties to this litigation. Let no extraneous matter enter into your deliberations. Your verdict in this case is not to be influenced by anything but the evidence and the law of the case. This is your twelfth trial day and the testimony, exhibits and law as charged today does not permit the delay or distraction of consideration or discussion of extraneous matters. Do not permit your fellow jurors in that room to raise or discuss anything outside of the evidence and

the law of this case. Do not raise or discuss what happened to someone else somewhere else at some other time, what may have happened to some relative or somebody of yours, something you have read about or seen about in your reading. Those are extraneous matters and have no part in your deliberation or determination of this case. You have sufficient evidence in this case and sufficient law to take all your time on just the law and the evidence of this case in making your determinations."

In *State v. Bucanis*, 26 *N. J.* 45, 56 (1958), we announced:

"\* \* \* we must not be so idealistic as to close our eyes to the realities of human nature as they are continually portrayed during our trial process. Each criminal trial is a swiftly moving dramatic contest which often evokes strong emotions in the participants. The charged atmosphere created frequently makes it arduous for the prosecuting attorney to stay within the orbit of strict propriety.

We have necessarily held, therefore, that not every suspected deviation from perfection on the part of a prosecutor will justify a reversal of a conviction. Before such a result ensues, his infraction must be clear and unmistakable and must substantially prejudice the defendant's fundamental right to have the jury fairly evaluate the merits of his defense."

Having made a complete survey of all of the challenged remarks made by the prosecutor, in their full context, as they relate to the testimony in the case, and considering the failure of the defendant's attorney in all excepting one instance to note an objection, plus the emphatic and impressive direction of the court that the issues should be decided solely on the evidence as presented, we must necessarily determine that a reversal is not warranted upon the ground that the prosecutor's remarks caused a miscarriage of justice or brought about a verdict which was the result of mistake, partiality, prejudice or passion.

Defendant contends the jury's verdict was "not founded upon proved facts." We are convinced, however, that the accumulation of evidence was more than sufficient to justify a finding of guilt beyond a reasonable doubt. Clearly, defendant's conviction was warranted.

The State's theory of how the murder occurred, as supported by the record, is that Smith and Victoria Zielinski drove into the sand pit sometime between 8:30 and 9:00

P. M. on March 4, 1957. Soon after they had arrived, Smith began to force his attentions upon the girl. He lifted up her sweater and, when she resisted, tore the right side of her brassiere from her bosom. He then bit her upon the right breast.

She struggled out of the car, screaming that she was going to tell her father, and ran up the dirt road and out of the sand pit. Fearful that she would disclose his sexual advances to her family, Smith seized a baseball bat from the back of the car, jumped out and began to chase her, losing his shoe in the process. He caught her a short way up Fardale Avenue from the sand pit and struck her with the baseball bat, dislodging some of her hair, which fell to the ground in a bloody clump. On Fardale Avenue, she lost one loafer and the kerchief which she was wearing upon her head.

Smith threw the bloody bat into the woods near the intersection of Fardale Avenue and Chapel Road. He dragged her unconscious or stunned body back into the sand pit and onto the top of the dirt mound. He viciously crushed her head with rocks and dumped the lifeless body over the edge of the mound.

Returning to Gilroy's automobile, he hurriedly fled from the scene, in his anxiety leaving his shoe behind. He stopped on Chapel Road just long enough to throw Victoria's pocketbook and school books into the woods. When he arrived home he washed up and subsequently went back to the scene of the crime in order to retrieve the incriminating shoe. Later, he endeavored to conceal his bloody shoes, socks and trousers.

Smith's confession contains direct admissions of guilt; i. e., "That's when it really hit me hard I must have been the one who really did it." Every fact he related therein confirms the State's version of the crime. At the trial, he attempted to nullify the compelling effect of the confession by maintaining he had lied in order to avoid implicating D. H., who had threatened his family. This explanation verges upon the incredible.

Before making his confession, Smith requested and received an opportunity to confer with a spiritual advisor. He admitted stating to the police early in his interrogation that if they wanted a "fall guy" they should "grab D. H." This statement somewhat belies his subsequent contention that he falsified his confession through fear of the retribution D. H. would wreak on his, Smith's, family if Smith involved D. H. in the crime. Were he truly in fear of D. H., he would not have urged the police to seek out and arrest the latter. Moreover, Smith admitted giving "substantially" the same confession to three doctors who had interviewed him previous to trial, while he was in jail.

Smith testified D. H.'s threat was delivered on Main Street in Ramsey at approximately 9:20 P. M. on the night of March 4. D. H. stated he did not see Smith at all on the night of March 4 and that at 9:20 P. M. he was in a tavern a number of miles away. A friend of both D. H. and Smith confirmed D. H.'s presence in the tavern at the time in question. Furthermore, according to Smith's story at trial, D. H. must have appeared at the sand pit between 8:30 and 9:00 P. M. Yet the pharmacist at the drugstore where D. H. worked testified D. H. was sent to pick up merchandise at another drugstore in Ridgewood, a 16 to 20-minute trip according to one of the officers who clocked it, at 8:35 P. M. and returned shortly before 9:00 P. M. with the right package, not leaving the store again until shortly after 9:00 P. M. The combined and impressive testimony of D. H.'s "alibi" witnesses is totally incompatible with defendant's position that D. H., not he, killed Victoria.

Additionally, all of the incontrovertible physical facts point to defendant's guilt, as do his actions after his admitted struggle with Victoria.

His footprints were discovered near the mound of dirt, although he denied being back in that vicinity. Both of his shoes were stained with blood. The tongue of one was missing and both soles had been partially removed. His socks and trousers were also heavily impregnated with blood. An analysis disclosed that the blood on defendant's clothing was

the same type as that covering Victoria, but a different type from defendant's. The chemist and toxicologist who appeared for the State testified the stains on Smith's left trouser leg were caused by "splashing," as revealed by their disconnectedness and "dumbbell appearance."

Smith attempted to account for the stains by explaining that they had gotten onto his clothing when he examined Victoria's head wound after she returned to the sand pit with D. H. The number, richness and location of the stains refute this explanation.

It is not disputed that the baseball bat was in the back of Gilroy's car when Smith borrowed it, and the same bat was later recovered near the scene of the crime, covered with blood. Significantly, blood stains were found on the front seat of Gilroy's car on the driver's side and not on the passenger's side where Smith claimed to have placed Victoria, intending to take her to the hospital, before D. H. pulled her out of the car.

The defendant, at various times, gave several different explanations of how he received the cuts and contusions on his knees. The jury was justified in concluding they were sustained when he fell while chasing Victoria.

Defendant's conduct and general demeanor reflected a noticeable consciousness of guilt. He testified he was not particularly perturbed and did not leave the sand pit in a hurry after his encounter with D. H. and Victoria. Yet, he drove off in sub-freezing weather without his shoe, which he claimed had come off right by the car when he jumped out upon seeing two figures approaching. There is no consistency between this act and the story he told at trial.

Why did Smith inform Gilroy that he had vomited on his trousers and had had to throw them away when he was driving back to the trailer with Gilroy on the night of March 4? Would a clear conscience have dictated an attempt to conceal Victoria's books and handbag and his own blood-stained socks and trousers in the woods? Normal conduct would have been to drop the socks and trousers into the

garbage can outside the trailer and to return the books and pocketbook at a later date.

Smith testified he had thrown his shoes away after taking them, on March 5, 1957, to a shoemaker in Ramsey who had informed him they were not worth repairing. This was not corroborated by the shoemaker, whose absence was unexplained.

Turning to Smith's most important contention, he makes much of the fact that the Bergen County Medical Examiner initially estimated the time of death as being in the neighborhood of 12:00 or 1:00 A. M. on March 5. Actually, however, as has already been indicated, the examiner testified that because of the winter weather the time when death occurred could not be accurately fixed; "It could have been earlier than 11 o'clock. * * *" The jury was entitled, on the evidence submitted, to conclude, as it did, that only defendant could have given the exact moment of death.

All the facts and circumstances proven or admitted by the defendant, taken in their natural sequence, attributing to them only their normal import and weight and excluding all except their logical and credible inferences, circumscribed by caution and a realistic approach, produce a vivid consciousness of guilt justifying the jury's verdict.

A reading of the record firmly and impressively convinces the impartial mind of the truth of the charge made against the defendant beyond a reasonable doubt.

The crime involved is not pleasant nor is the punishment inflicted, but such is the law as it stands upon our books, vigorously and challengingly upheld by the trial jury. The record leaves no room to disturb the jury's finding. Our conclusions support it.

The judgment of conviction is affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, FRANCIS and PROCTOR—6.

*For reversal*—None.