678 A.2d 312

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. W.L., SR., DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted February 22, 1996—Decided July 2, 1996.

Before Judges KING, KLEINER and HUMPHREYS.

*Peter R. Willis*, Esq., attorney for appellant (*John A. Young, Jr.*, on the brief).

*Deborah T. Poritz*, Attorney General, attorney for respondent (*Wendy Alice Way*, Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

HUMPHREYS, J.A.D.

The defendant appeals his conviction by a jury of sexual assault contrary to *N.J.S.A.* 2C:14–2(b) (count one); criminal sexual contact contrary to *N.J.S.A.* 2C:14–3(b) (count two); child abuse contrary to *N.J.S.A.* 9:6–1 and 9:6–3 (count three); and endangering the welfare of a child contrary to *N.J.S.A.* 2C:24–4(a) (count four). The defendant's natural son W.L., Jr., ("W.L."), age four, was the victim. Defendant was also found guilty of endangering the welfare of his ten year old step-son L.C. contrary to *N.J.S.A.* 2C:24–4(a) (count eight). The defendant was acquitted on counts five, six and seven which charged him with sexual assault, sexual contact and child abuse against L.C. The judge merged counts two and three into count one. The defendant was sentenced on count one to ten years in prison and on counts four and eight to a concurrent term of five years. The defendant appeals his conviction and sentence.

We reverse. Improper statements by the prosecutor in his opening statement and summation coupled with prejudicial psychiatric evidence denied the defendant a fair trial and were clearly

capable in this close case of producing an unjust result. *See R.* 2:10–2.

I

The defendant's wife ("T.L.") testified that in November 1990 she heard W.L. scream. She went to the bathroom and saw the defendant apparently masturbating W.L., then four years old. She asked the defendant what he was doing and he began to cry. Two months after the incident, the defendant left the marital home.

T.L. did not report the bathroom incident to the police or the Division of Youth and Family Services ("DYFS") or apparently anyone else. The matter first surfaced a year and half later when she testified about the incident at a hearing in a custody dispute with the defendant.

A year before the incident, the defendant's step-son, L.C., had reported to a school counselor that the defendant had been touching his private parts. L.C. and W.L. testified at trial that the defendant had sexually abused them. The State introduced evidence at the trial through a psychiatrist that W.L. at age seven had threatened suicide and been hospitalized for two weeks. The psychiatrist testified that W.L. had told her at the hospital that his father had "touched him." The psychiatrist also testified that in her opinion W.L. suffered from post traumatic stress disorder and that this was not inconsistent with a victim of child abuse.

Defendant testified at trial and denied any sexual abuse. As to the bathroom incident, he testified that he was washing his son's buttocks after his son had a bowel movement.

The defense presented other witnesses. A DYFS worker testified that she had interviewed L.C. in September 1989 and he denied any sexual abuse by the defendant. The DYFS worker recommended that the DYFS investigation be closed and it was. Another DYFS worker testified that she interviewed W.L. in May 1991 and he denied having been "fondled" by anyone including his

father. However, she also testified that L.C. told her that the defendant had fondled him and W.L. A supervisor of juvenile visitation for Hudson County testified that he saw some thirty visitations between defendant and his son and had seen no problems.

A psychologist testified on behalf of the defendant that a post traumatic stress disorder may be the result of a parent pressuring a child to repeat a story that may not be true. The psychologist also testified that in her opinion W.L. was not suffering from a post traumatic stress disorder. She conceded on cross-examination that a diagnosis of post traumatic stress disorder caused by sexual abuse was "one of the possibilities."

## II

The prosecutor's opening statement consisted almost entirely of a flagrant appeal for sympathy for the victim and an equally flagrant attack on the defendant's character and credibility. The prosecutor said:

Now, a lot of people you know they think about well pressures of life, of my life get so much to me, geez wouldn't it be nice to go back be a kid again, have those things. I didn't have any worries, I didn't have a job I had to be to, didn't have to pay bills, worry about this or that. That's one part of it.

When you think about it, when you're a kid, you also have something that an adult doesn't, you lack something an adult has which is freedom. The ability to protect yourself. When you're older if things get too much, if you want that private little moment you can do whatever it is you want to do. If you like to jog, go to a museum, go fishing, whatever it is you can do it, jump in a car, take a drive be by yourself. When you're a kid, you don't have that. You just can't say that's it, I've had enough, I want to be by myself, go off by myself, especially if you're a young child like the children in this case were, one of them still is.

When you're a child, when you think about it you have maybe three things that should be your own and that should be unique to a child which should never, ever be tampered with or damaged by anybody. You should be safe in your home. When you talk to a kid, don't go out talk to strangers, watch when you cross the street, don't talk to this guy in the playground or that guy on the corner. But when you're home, it's supposed to end, I'm home now let's just relax.

You know when you're a kid you should also have your own body, your own body should be yours, we call our private parts our private parts for a reason, because you know they're not exposed to everybody, we don't have to have like——we have our face exposed, our hair, whatever, everybody can look at. Your private parts

are obviously covered up. To a kid it's one of the few things I have, my privacy, some kids call it my private part, mine, they're mine.

You also have when you're a kid, you're supposed to have innocence, you know, you're suppose to be a kid, you're supposed to worry about whether or not I'm going to get that candy bar or whether or not I'm going to make the little league team, you're not supposed to worry about or know about sex. I mean it's just not right.

Now, those three things, the sanctity of the home, the sanctity of ones own body, the sanctity of that child like innocence, all of those things were shattered and taken away in this case on two boys, two boys. One of them by their father, the other by their stepfather, it's the same man, it's this man right here, this defendant. He took these things away from little [W.L.] who's now seven, who was then about four and a half, five years old and [L.C.] his stepson who's about 15 now, was about 10, 11, 12. He terrorized these children, terrorized their mother and destroyed the family, destroyed them.

About November of 1990 Miss——you'll see her here, [T.L.] is cooking dinner in her home, she hears her little boy [W.L.] scream out. Now, she basically let it go the first time because he's in there and his father is giving him a bath, suppose to be a nice thing, right? She hears him scream out a second time. She runs in and what she saw there is the evidence in this case, part of it and also just an all too familiar horrible story.

Her husband, this man right here, the defendant was naked, he had his hands on his own penis and the little boy [W.L.] was seated upon the sink and his father was masturbating him, his father was basically I guess you would say playing with this little boy's penis.

And she said, you'll hear her say because it's unusual, look we're adults here, we can talk about these things, it's a little boy. And it was unusual that she noticed the child's penis was erect. She said my God why is my son's penis——what are you doing, what are you doing? This guy over here put a towel around himself, sat down, began to cry. She took the child out.

Now, one of things she thought about at that time was the fact that about a year earlier her son and his stepson had told or found out by school people that when he would sleep at night again the defendant would come into his room when he was sleeping and put his hands into the boys pants and touch his penis and touch his anus and he'd tell him to stop and he wouldn't stop.

She thought about how he told that to her and how upset he was and how terrified she was of this man and you'll hear about it because he controlled everybody. How she believed him, she believed him when her own son told her these things and when he threatened to go down there and sue everybody at the school, she said oh, okay, okay and now here it comes back, she finds out that happened, because she saw it happened here with her other son.

So for about the next three months or so she said get out, that's it, out. He wouldn't leave and didn't have the decency to leave when he was asked after this terrible thing, they basically lived, barricaded her and her two boys petrified until he finally left.

Now, again as I said she was terrified of him, she didn't say a thing until about May of 1991 when she sought custody of the boy against him. At that point she told the Judge downstairs about what happened.

Now, when they went down there the defendant also spoke about what happened with [W.L.] and what he said, well, it's for you to decide. But what he said when you hear it is so perverse in it——in that it's so ridiculous that to expect anybody to believe it is really offensive. He said that he was asked your son was screaming, your wife ran into the bathroom, saw this, what do you have to say about that? Well yeah he was screaming, this is him talking now. He would scream every time we went into the bathroom because see I was trying to get into this habit after he would go to the bathroom, I would put him up there on the sink and I would take soap and water, as he said I would wipe his little butt out then because I believe that it was necessary to maintain these delicate tissues in the body. I would take cold water, slash it up there into his butt. That's why he was screaming.

And the reason why his penis was up, I don't think it was up, but the reason why his penis was up well see he wasn't circumcised like I wanted him to be and the pediatrician said he should look like his brother. I didn't have the nerve to take the skin off his penis myself so I just couldn't stand it. She was supposed to look after it and she never did and it just it was, it wasn't right that should happen. That was it.

Like that, that this happened and this boy, this little boy is saying his father did these horrible things to him and the mother says she saw it and he's saying that well he was teaching him hygiene. The thing about and I don't quite understand what the explanation about the penis and the circumcision is all about, but that's what he said.

So she said enough was enough, the reign of terror which is what it was and these boys are living with it till today and I hope not much longer, but who knows, is over, is over. Because this guy here, the defendant destroyed these people and that's just not right, that's why we come here to you, to the community to hear the case and you decide what happened, you decide if he's guilty or if he's innocent. You listen to the evidence and if you feel the State has not proven this case beyond a reasonable doubt, then you find him not guilty. But if you do, you have an equally strong duty to find him guilty. I'm going to tell you here that I submit to you that after you hear it you will find the man guilty because he is. You know the little boy [W.L.] who you're going to see, he's just a little thing. About April of this year he had to be taken to the hospital because he said that he was going to put roach spray into his own body and kill himself, he's seven years old. Like I said you know when a seven year old child wanted to kill himself, well that says a lot about the truth.

Now, about the roach spray. That's an odd thing for a seven year old to think up on his own. Well, you'll also hear from [W.L.] one of the other things his father did to terrorize the family, to just distort this child was he would say when your mother is sleeping take the roach spray, go pour it down her mouth. Or when your cousins are over, staying over, when they're sleeping, take the knife, stab out their

eyes.[1] He's five years old for God's sake. He remembers this when he's seven and this is all too much.

The doctor said well he suffered from is this, you probably heard this term, people coming back from war suffer from post traumatic stress disorder. A seven year old boy has, he has this and he want to kill himself because of it.

Now, when you consider this case, you consider those things. You'll hear everybody that comes in here, you're going to hear the two boys.

Now, that's why we're here on account of all that, on account as I said a seven year old kid, he should be out today in school, when he comes home he should go out, play ball, trade baseball cards or whatever, but he's not. He's in here testifying about how his father, his father did this to him, touched his own body like that. And he suffers the way he does and the 15 year old will come in here [L.C.], five years or so after, he still lives with it.

Here he is, he's a young man coming into manhood, 15 years old. What does he have as his legacy from his childhood? That he was violated, that he was violated by not his father but somebody his mother took in and was supposed to protect him as well, like he was his own son. We're here on account of that.

Also the mother went through hell, went through hell, her life was terrorized to the point that her own son from another marriage, [L.C.], her own flesh and blood who was violated by this guy that she brought in, that she brought in and that happened to him. The son they had together, it happened to him too after she already knew about the first kid, she lives with that. She lives with how petrified she was of this man that she couldn't even protect her own.

We're here on account of all that. I tell you that this all happened, all this destruction happened because of one person, that one person is guilty.

 The purpose of a prosecutor's opening statement is to present to the jury an outline or summary of what the State expects to prove. Prosecutors should limit themselves in their openings to what they will prove and not "anticipate" their "final argument." *State v. Ernst*, 32 *N.J.* 567, 577, 161 *A.*2d 511 (1960), *cert. denied*, 364 *U.S.* 943, 81 *S.Ct.* 464, 5 *L.Ed.*2d 374 (1961); *State v. Hipplewith*, 33 *N.J.* 300, 309, 164 *A.*2d 481 (1960). Here the prosecutor made a highly inflammatory opening statement for the obvious purpose of generating sympathy for the victim and anger and hatred for the defendant. The prosecutor's opening clearly ignored the warnings in *State v. Pennington*, 119 *N.J.* 547, 566–567, 575 *A.*2d 816 (1990), against a prosecutor using the victim

---

[1] No evidence was introduced through W.L. (or anyone else) about the defendant telling W.L. to pour roach spray down his mother's mouth or to stab out his cousins' eyes.

and the victim's family to inflame the jury and divert it from an objective consideration of the material facts.

In his summation, the prosecutor continued his appeals for sympathy and hate. He said:

He took his son to Puerto Rico. He admitted this you don't have to like try to understand it or analyze it. He told you he took the boy to Puerto Rico without telling anybody.

Now, I asked him isn't that something that should have been discussed, his answer was no. That answer tells you a lot about the respect he had for anybody there including [T.L.]

He thought it was all right or there was such a situation created in that household or that family that it was all right to take the boy while his mother is out shopping out of the country for about two weeks without telling a soul about it. Think about the audacity, *the lack of compassion and humanity you have to have,* really think about doing that to anybody, let alone with your own child and your wife. Just walk out the door, have her come back, find an empty house, thinking God's knows what happened. That's what we're dealing with here.

When you talk about doing these types of things to children to even for most people to imagine that such things exist at all is unfathomable because it is, it's *heinous, it's a horrible inhumane, almost unworldly type of thing to think about.* So it's a hard thing to deal with and when you're dealing with it, you think about things like that, that what kind of a person would do this and would a boy be so affected by the thought of it that he would be so upset or that it really happened to him.

. . . . . . . .

The specifics that he talks to you about, the specific things that he says, they should be chilling to you, because there in lies the answer. He talks about this washing procedure. Well, the whole thing is rather bizarre. I think I've never heard of such a thing, to take the boy, put him up on the sink like that every time he had a bowel movement, splash this cold water such that he told you . . . [W.L.] would scream.

Even if you believe that's what was going on there, that is so bizarre, so strange and so I would say to you lacking in care and concern for that boy that you really have to think about anybody that would do that, admit to doing that, think about them because that is the kind of person that we're talking about here that would commit this. This act that *is so unlike what we like to think of as being real and being human,* that we shudder, we shudder, we shudder when we hear these accusations, we don't want to believe they're real.

He's coming in telling you he engaged in this bizarre ritualistic procedure. He said it was ritualistic, it would happen every time, every time the boy cried because he was surprised. How could you be surprised at something that happens every time? A scream, ladies and gentlemen, a scream, *a blood curdling scream that* tells a mother inside that something is wrong, makes her run into that bathroom is what

happened. She did run.in, he told you she ran in, not a yell like the shower is too cold, let out a little yell, this is a *scream within a boy's soul* that brings her into that room, thank goodness.

. . . . . . . .

Little [W.L.] told you what happened. [T.L.] probably is angry all right, she should be. She was beaten, boy tells you that she has a court ordered restraining order, something she didn't purchase out of a man, she went to a court, the Judge gave her those restraining orders. *He did cheat on her, have a baby with someone else, paying child support.*

. . . . . . . .

*That says a lot about the attitude I guess they have towards women,* that is the explanation for everything here and the other explanation is well I was washing out this kid's buttocks and he didn't like it.

THE COURT: I'm sorry, did you say that was the attitude towards women, are you referring to the defendant?

[PROSECUTOR]: Yes.

THE COURT: I'm not going to allow that, strike that please.

[ (Emphasis added).]

The prosecutor even attacked the judge's jury charge. The prosecutor said that a judge's charge is "boring, its confusing and it's kind of ridiculous in a lot of senses of the words." The judge interjected: "Speak for yourself, sir, it's not boring, it's not confusing, it's not ridiculous."

A prosecutor has considerable leeway in summing up the State's case. *State v. Williams,* 113 *N.J.* 393, 447, 550 *A.*2d 1172 (1988). A prosecutor may summarize the State's case graphically and forcefully. *State v. Johnson,* 287 *N.J.Super.* 247, 265, 670 *A.*2d 1100 (App.Div.1996). The factors to be considered in reviewing prosecutorial conduct include: "whether defense counsel made a timely and proper objection, whether the remark was withdrawn promptly, and whether the court gave the jury a curative instruction." *State v. Zola,* 112 *N.J.* 384, 426, 548 *A.*2d 1022 (1988). Defense counsel here did not object. Further, "[p]rosecutorial misconduct is not ground for reversal of a criminal conviction unless the conduct was so egregious that it deprived defendant of a fair trial." *State v. Ramseur,* 106 *N.J.* 123, 322, 524 *A.*2d 188 (1987).

██ However, the prosecutor may not make "inflammatory and highly emotional" appeals which have the capacity to defer the jury from a fair consideration of the evidence of guilt. *State v. Marshall*, 123 *N.J.* 1, 161, 586 *A.*2d 85 (1991). The prosecutor's comments must be confined to the evidence and the reasonable inferences to be drawn from the evidence. *State v. Johnson*, 287 *N.J.Super.* at 265, 670 *A.*2d 1100; *State v. Smith*, 27 *N.J.* 433, 460, 142 *A.*2d 890 (1958). A criminal conviction should be reversed if the prosecutorial misconduct is clear and unmistakable and substantially prejudices a defendant's fundamental right to have a jury fairly evaluate the merits of the case. *See Smith, supra,* 27 *N.J.* at 462, 142 *A.*2d 890.

██ The inflammatory appeals here were highly improper. In this case, as in *State v. Gregg*, 278 *N.J.Super.* 182, 191, 650 *A.*2d 835 (App.Div.1994), *certif. denied,* 140 *N.J.* 277, 658 *A.*2d 300 (1995), the prosecutor's excessive remarks were "plainly designed to impassion the jury." In a close and sensitive case such as this, emotional appeals by the prosecutor calculated to arouse sympathy for the victim and hate and anger against the defendant have a strong potential to cause a miscarriage of justice. *See State v. W.L.*, 278 *N.J.Super.* 295, 301, 650 *A.*2d 1035 (App.Div.1995); *R.* 2:10–2. A thorough review of the record satisfies us that the defendant's fundamental right to a fair trial was substantially prejudiced by the prosecutor's improper opening and summation.

### III

██ The defendant's right to a fair trial was also prejudiced by the testimony of the psychiatrist. The defendant objected to the psychiatrist testifying. The defendant argued that he had received no advance notice that the State would rely on psychiatric testimony. Defense counsel first learned that the psychiatrist would be a witness the morning of the first day of trial when he received a copy of the psychiatrist's report.

The prosecutor stated that the psychiatrist would testify that W.L. was suffering from post traumatic stress disorder "brought

about" by the defendant's sexual abuse. Notwithstanding the late notice and the questionable admissibility of the testimony, *see State v. J.Q.*, 130 *N.J.* 554, 564, 617 *A.2d* 1196 (1993) and *State v. W.L.*, 278 *N.J.Super.* 295, 301–302, 650 *A.2d* 1035 (App.Div.1995), the judge permitted the psychiatrist to testify in the State's case. The judge also permitted the defense to obtain expert testimony to rebut or contradict the psychiatrist.

The psychiatrist testified that in April 1993, W.L. was admitted to a hospital because he had threatened to kill himself with roach spray and had also taken a knife to his chest. This was two and one-half years after the bathroom incident. According to the psychiatrist, W.L. "spontaneously" said that his father had in the past "touched him." When he said that, W.L.'s "affect" changed and he became very angry. W.L. also said that "at home," he was "always remembering the sexual abuse."

The psychiatrist diagnosed W.L. as having post traumatic stress disorder. She described the diagnosis as a "set of symptoms, behaviors or experiences that develop characteristically ... [a]fter a psychological trauma." In her professional opinion, this diagnosis was "not inconsistent" with a victim of sexual abuse.

(a) *W.L.'s Statements to the Psychiatrist*

Out of court statements by a child who was allegedly a victim of sexual abuse may be admitted in evidence if the conditions set forth in *N.J.R.E.* 803(c)(27) are met. That rule provides:

> Statements by a child relating to a sexual offense. A statement by a child under the age of 12 relating to sexual misconduct committed with or against that child is admissible in a criminal, juvenile, or civil proceeding if (a) the proponent of the statement makes known to the adverse party his intention to offer the statement and the particulars of the statement at such time as to provide him with a fair opportunity to prepare to meet it; (b) the court finds, in a hearing conducted pursuant to Rule 104(a), that on the basis of the time, content and circumstances of the statement there is a probability that the statement is trustworthy; and (c) either (i) the child testifies at the proceeding, or (ii) the child is unavailable as a witness and there is offered admissible evidence corroborating the act of sexual abuse; provided that no child whose statement is to be offered in evidence pursuant to this rule shall be disqualified to be a witness in such proceeding by virtue of the requirements of Rule 601.

[*Ibid.*]

It is questionable whether the condition set forth in subparagraph (a) was met. Notice given on the morning the trial began would not likely give the defendant a fair opportunity to meet the psychiatrist's testimony. Clearly, the condition in subparagraph (b) was not met. The court did not conduct a reliability hearing and did not make any findings as to the trustworthiness of W.L.'s statements to the psychiatrist. The psychiatrist was briefly questioned at a hearing conducted immediately prior to her testimony. The hearing and questioning, however, pertained only to certain information in her report and not as to the trustworthiness of the child's statements.

Defense counsel did not specifically request a subsection (b) hearing and could therefore be deemed to have waived it. *See State v. J.Q., supra,* 130 *N.J.* at 584, 617 *A.*2d 1196. However, the cumulative effect of the violation of the Evidence Rules coupled with the prosecutor's misconduct and the admission of the psychiatrist's opinion testimony (see the next subsection of this opinion) compels a reversal of this conviction. *See State v. Orecchio,* 16 *N.J.* 125, 129, 106 *A.*2d 541 (1954).

### (b) *The Psychiatrist's Opinion*

The psychiatrist did more than merely testify to W.L.'s out of court statements and W.L.'s "affect" when he made those statements. The psychiatrist brought to the attention of the jury that W.L. had been admitted to a hospital for threatening to kill himself. Her diagnosis was that W.L. had a psychiatric disorder known as a post traumatic stress disorder. She defined that disorder as a "set of symptoms, behaviors or experiences that develop characteristically ... [a]fter a psychological trauma." She testified that her diagnosis was "not inconsistent" with a victim of sexual abuse.

In *State v. J.Q., supra,* 130 *N.J.* 554, 617 *A.*2d 1196, the Supreme Court considered at length the proper role of psychiatric opinions in child sexual abuse prosecutions. The Court concluded that the Child Sexual Abuse Accommodation Syndrome

("CSAAS") had a "sufficiently reliable scientific basis to allow an expert witness to describe traits found in victims of such abuse to aid jurors in evaluating specific defenses." *Id.* at 556, 617 *A.*2d 1196. The Court reversed the conviction, however, because the expert's opinion "went beyond that limited scope and included opinions on commonplace issues, such as credibility assessments derived from conflicting versions of an event and not-yet scientifically established opinions on the ultimate issues that are for jury resolution." *Ibid.* The Court said that such expert opinion testimony may be used "on rebuttal 'to rehabilitate' the victim's testimony when the defense asserts that the child's delay in reporting the abuse and recanting of the story indicates that the child is unworthy of belief. . . ." *Id.* at 564, 617 *A.*2d 1196 (citation omitted).

In *State v. W.L., supra,* 278 *N.J.Super.* at 301, 650 *A.*2d 1035, we concluded that expert testimony regarding CSAAS is not admissible as substantive evidence.

> That is, it is not admissible as proof that a child who exhibits the behavior constituting the syndrome was actually abused. Said another way, proof that a child's conduct accorded with all or most of the five patterns of behavior embraced by the syndrome . . . is not evidence of defendant's guilt.
>
> [*Id.* at 301–302, 650 *A.*2d 1035 (footnote omitted).]

We recognized that such evidence may be admissible to:

> shield the child from the inference that she is not telling the truth which might otherwise arise in the minds of jurors by reason of her failure to have promptly disclosed the fact that she was abused or her failure to have promptly sought help from a responsible adult. As we understand the holding of *J.Q.,* therefore, the role of CSAAS evidence is the other side of the coin of fresh complaint evidence and fulfills the same function, namely, to respond to preconceived but not necessarily valid ideas jurors may have regarding the consistency of the post-assault conduct of a victim who claims to have been sexually abused with the fact of an actual act of abuse. . . . In sum, CSAAS evidence is admissible to support or rehabilitate, as it were, the credibility of the victim whose post-assault conduct may be misperceived by the jury as inconsistent with the truth of her claims.
>
> [*Id.* at 302, 650 *A.*2d 1035 (citations omitted).]

Here, the State presented the psychiatrist's testimony in its direct case, not on rebuttal, *see State v. J.Q., supra,* 130 *N.J.* at 564, 617 *A.*2d 1196. The testimony was for the purpose of

showing that W.L. had been sexually abused because two and one-half years after the abuse, W.L. had threatened suicide and a psychiatrist had found "the affect of sexual abuse to be on [the child]."

The opinion testimony of the State's psychiatrist was not offered to "rehabilitate" a witness, *State v. J.Q., supra*, 130 *N.J.* at 564, 617 *A.*2d 1196, or to disabuse a jury of "preconceived but not necessarily valid ideas...." *State v. W.L., supra*, 278 *N.J.Super.* at 302, 650 *A.*2d 1035. The defendant did not argue that W.L. was unbelievable because W.L. had not disclosed the abuse or sought help. The mother had observed the bathroom incident; hence, the alleged abuse had been disclosed. Thus, the expert evidence was not for the purpose of "shield[ing]" the victim from any improper inferences. *Ibid.* Nor did the psychiatrist testify about any recanting by the child. The only function of the psychiatrist's opinion testimony was an improper one, i.e., to be substantive evidence that the defendant had sexually abused W.L.

The prosecutor took full and improper advantage of this expert testimony. He insinuated in his summation that the psychiatrist's testimony showed that W.L. was telling the truth when he claimed that he was a victim of sexual abuse by the defendant. The prosecutor said:

> Now, that is——you know it's a horrible thing that a seven year old boy has to have that in his life, that he has to go to a hospital for any reason, but especially when it's because he's telling his mother that he's going to kill himself, he's going to drink roach spray, he's putting a knife against his chest. That right there goes way beyond anything.

> . . . . . . . .

> When these kids came in here, [W.L.] and his brother [L.C.], you think to the way they reacted, the things that they said, the way they support each other, the way they're supported by the defendant's own testimony and you know they're telling the truth.

> [The psychiatrist] ... examined [W.L.] in April and she diagnosed him as having post traumatic stress disorder and she said that the reason she diagnosed him as such after spending two weeks in the hospital with him is because of what she found, *the affect of sexual abuse to be on him.*

> [ (Emphasis added).]

Clearly, the prosecutor improperly attempted to use the psychiatrist's diagnosis as substantive evidence that the defendant had sexually abused W.L., that W.L. had threatened suicide because of that abuse and that two and one-half years later W.L. was still suffering from the defendant's sexual abuse.

We recognize that the judge in his charge correctly advised the jury that the psychiatrist's testimony was not offered to prove the "ultimate issue, the guilt or innocence of the defendant." The judge said the evidence was admitted "to help you understand the idea that children do sometimes delay in reporting abuse and that children sometimes do admit, then deny an experience." However, the psychiatrist did not testify that children do sometimes delay in reporting abuse or that children sometimes admit and then deny an experience. In the absence of such testimony, the judge's explanation makes no sense and may have misled or confused the jury.

In any event, curative statements in the judge's charge "are not always palliative or sufficient to mitigate the damage" resulting from improper evidence or comment. *See Demers v. Snyder*, 282 *N.J.Super.* 50, 58, 659 *A.*2d 495 (App.Div.1995). Moreover, the prosecutor may have weakened any curative effect by telling the jury that the judge's charge would be boring, confusing and ridiculous.

The improper admission of this expert testimony, in tandem with the prosecutor's improper use of it, carries in this case a strong potential for an unjust result. The State had only four witnesses, the mother, W.L., L.C., and the psychiatrist. The jury by its verdict of not guilty apparently did not accept the testimony of L.C. The evidence of guilt with respect to W.L. was far from ample. Essentially, it rested on only one incident, an alleged touching in November 1990 by the father of his son's penis in the bathroom. The mother's testimony was vague and contradictory. The defendant testified and denied any improper conduct. DYFS investigated the allegation concerning L.C. and apparently found nothing warranting any action. W.L.'s suicide threats could readi-

ly have resulted from other turmoil in the household; the mother had beaten L.C. with a belt resulting in an investigation by DYFS.

Furthermore, W.L. was only four years old at the time of the incident. The trial was three years later. Children as a class are not "inherently suspect witnesses." *State v. Michaels,* 136 *N.J.* 299, 308, 642 *A.*2d 1372 (1994). The Court said in that case:

under certain circumstances, children's accounts of sexual abuse can be highly reliable.... Nevertheless, our common experience tells us that children generate special concerns because of their vulnerability, immaturity and impressionability, and our laws have recognized and attempted to accommodate those concerns, particularly in the area of child sexual abuse.

[*Ibid.* (citations omitted).]

Those concerns are heightened in this case in view of the mother's failure to report the bathroom incident to the proper authorities and her first raising it one and one-half years later in the course of custody litigation with the defendant. In an acrimonious custody battle, a baseless charge of sexual abuse hurled by one parent against another is unfortunately not uncommon.

In sum, in this case as in *State v. W.L., supra,* 278 *N.J.Super.* at 301, 650 *A.*2d 1035, the vital issue of guilt was "exceedingly close" and "any error that could have appreciably tipped the credibility scale would have to be regarded as plain error having the capacity to have affected the outcome of the trial."

Errors that cut "mortally" into the substantive rights of an accused cannot be overlooked. *See State v. Shomo,* 129 *N.J.* 248, 260, 609 *A.*2d 394 (1992). In *State v. Orecchio, supra,* 16 *N.J.* at 129, 106 *A.*2d 541, Justice Jacobs stated:

The sound administration of criminal justice in our democracy requires that both the end and the means be just. The accused, no matter how abhorrent the offense charged nor how seemingly evident the guilt, is entitled to a fair trial surrounded by the substantive and procedural safeguards which have stood for centuries as bulwarks of liberty in English speaking countries. This, of course, does not mean that the incidental legal errors, which creep into the trial but do not prejudice the rights of the accused or make the proceedings unfair, may be invoked to upset an otherwise valid conviction; under these circumstances it would be grossly unjust to the State and its people to grant a new trial, and in recent days this court has not hesitated to deny such relief to the defendant.... *Where, however, the legal errors are of such magnitude as to prejudice the defendant's rights or, in their*

*aggregate have rendered the trial unfair, our fundamental constitutional concepts dictate the granting of a new trial before an impartial jury.*

[ (Citations omitted) (emphasis added).]

We are satisfied that the errors here are of such magnitude in their aggregate that the defendant's right to a fair trial has been seriously infringed. A fair trial in child abuse cases is particularly important. In such sensitive cases, we must "tread a measured path that avoids ignoring the reality of child sexual abuse and avoids as well the possibility of unjust conviction of this most shameful of crimes." *State v. J.Q., supra,* 130 *N.J.* at 562, 617 *A.*2d 1196. The prosecutor's improper statements in his opening and summation together with the admission of prejudicial expert testimony pushed this case off that path. A miscarriage of justice is likely. This conviction must therefore be reversed.

Reversed and remanded for a new trial.