964 A.2d 845 (2009)
405 N.J. Super. 392
STATE of New Jersey, Plaintiff-Respondent,
v.
Sidney ATKINS, Defendant-Appellant.
No. A-4734-05T4
Superior Court of New Jersey, Appellate Division.
Submitted November 3, 2008.
Decided March 3, 2009.
*847 Yvonne Smith Segars, Public Defender, attorney for appellant (Susan Brody, Assistant Deputy Public Defender, of counsel and on the brief).
Theodore J. Romankow, Union County Prosecutor, attorney for respondent (Meredith Balo, Assistant Prosecutor, of counsel and on the brief).
Before Judges CARCHMAN, R.B. COLEMAN and SABATINO.
The opinion of the court was delivered by
COLEMAN, R. B., J.A.D.
Tried before a jury, defendant Sidney Atkins was found guilty of first-degree aggravated sexual assault, in violation of N.J.S.A. 2C:14-2a(1) (count one); second-degree sexual assault, in violation of N.J.S.A. 2C:14-2b (count two); and endangering the welfare of a child, in violation of N.J.S.A. 2C:24-4(a) (count three). At sentencing, the court found that aggravating factors two, three, six, and nine, N.J.S.A. 2C:44-1a(2),(3),(6) and (9), outweighed the non-existing mitigating factors, and the court imposed an aggregate term of nineteen years in State Prison, subject to the No Early Release Act (NERA) requirement that eighty-five percent of the sentence is to be served without eligibility for parole, N.J.S.A. 2C:43-7.2. Additionally, defendant was ordered to register upon his release in compliance with Megan's Law. The court merged counts two and three into count one for sentencing purposes.
After carefully reviewing the record in light of the contentions advanced on appeal, we conclude that reversible error occurred with respect to rulings concerning defendant's investigator, who was ordered to produce the notes of her interview with S.M., and whom the State was permitted to utilize as a rebuttal witness. Consequently, we remand for a new trial.
The proofs at trial reveal that in March 2004, defendant's aunt, E.F., was the matriarch of a large extended family. She lived in a single-family home in Union County with her two foster children, S.M., a six-year-old female, and T.M., a four-year-old male.[1] E.F.'s home has served as a central hub and refuge for various family *848 members who have lived there for varying periods of time. Also residing with E.F. in 2004 was her niece, W.M., and W.M.'s three children. Defendant, known to the family as "Junior," had lived with E.F. on and off over many years, but he had, by 2004, established a separate residence. He was, however, a regular visitor at E.F.'s house, and he helped with household chores, such as child care and maintenance.
In the early evening on March 10, 2004, E.F. received a telephone call from her daughter, R.W., informing her of an emergency concerning a relative who was a resident of the nursing home where R.W. was employed. E.F. asked her niece, W.M., to watch the children while she went to the nursing home. While the five children watched television in S.M.'s room, W.M. watched television in T.M.'s room, with the door kept ajar so she could hear the children. Shortly after E.F. left the house, defendant arrived. W.M. greeted defendant downstairs and told him of E.F.'s whereabouts. She then returned to watching television upstairs. At one point she saw defendant exiting the attic and at another point she asked him to fix a curtain in S.M.'s room. Defendant also left the home sometime during the evening to buy candy for the children. By the time E.F. returned home around 8:30 p.m., defendant had left the house again.
Upon her return, E.F. sent her two foster children upstairs to bathe while she made them dinner. From the bathtub, S.M. called out to E.F. and told her that her "pee-pee" was burning. E.F. wrapped S.M. in a towel, sat her on her bed and questioned the girl to determine why her private parts were burning. E.F. then examined S.M.'s genitals and observed that there was redness inside of her vagina. While E.F. was questioning and examining S.M., E.F. heard someone pacing in the hallway outside her bedroom door. W.M. testified that defendant, who had returned to the house, was the person pacing and he seemed "nervous." E.F. then instructed S.M. to go downstairs and eat dinner with her brother.
After her two foster children had finished eating, E.F. took S.M. back upstairs and resumed her questioning. At this point, S.M. told E.F. that "Junior did it." S.M. demonstrated what she meant by moving her hips back and forth in a humping motion. E.F. then awakened W.M. and began calling relatives at approximately 1:30 a.m. W.M. testified that she, too, examined S.M.'s genitals and that the child's vagina looked red, irritated and discolored. E.F.'s granddaughter, O.A., arrived at the house after having spoken to E.F. on the telephone. E.F. showed O.A. the panties S.M. had been wearing before her bath; they had "brightish looking stains" on them. O.A. also examined S.M.'s vagina and testified that it appeared red and did not look normal. When asked, S.M. told both W.M. and O.A. that "Junior did it," and demonstrated with her hips a bouncing up-and-down motion.
S.M. told E.F. the following events occurred: she was sitting on her bed watching television while the other children were downstairs watching television in the living room. W.M. was watching television in T.M.'s room. Defendant came into S.M.'s room, closed her door, and sat on her bed. Defendant took S.M.'s clothes off. He then got on top of S.M. and put his "weenie" in her "pee-pee," moving it all around (back and forth). S.M. told defendant to stop, but he kept going. Defendant also put his hands in her pee-pee. He did not make any noises. S.M. did not yell.
On O.A.'s advice, E.F. called the police. When the police arrived, they confiscated the bed linens and two pairs of panties belonging to S.M. These items were later *849 sent to the State Police Laboratory for forensic testing. The panties that S.M. had been wearing before her bath revealed evidence of human blood and amylase, a bodily fluid; however, the only DNA chemically detected was female and it matched S.M.'s control sample.
The police transported E.F. and S.M. to the hospital for a medical examination of S.M. At approximately 3:26 a.m., Dr. Euton Laing examined S.M., found redness on her inner thighs, but made no other conclusive findings. Around 5:00 a.m., E.F. and S.M. were taken to the Child Advocacy Center, a division of the Union County Prosecutor's Office. There, they met with Detective Joseph Genna, who conducted a videotaped interview of S.M. and took a sworn statement from E.F. Genna also photographed bruises on S.M.'s thighs.
E.F. and S.M. were next taken to the Dorothy B. Hersh Regional Child Protection Center where S.M. was examined by Dr. Linda Shaw. Dr. Shaw found a discolored area on S.M.'s hymen that was lighter in color and she concluded it was possibly caused by some sort of recent trauma, and may have been the sight of bleeding twelve to twenty-four hours earlier. Dr. Shaw observed no bruising or lacerations on S.M., but did determine that S.M.'s physical condition could be consistent with S.M.'s account of the alleged sexual abuse.
Meanwhile, defendant returned to E.F.'s home the next morning, March 11, 2004, and W.M. refused to let him in. She told defendant that E.F. had taken S.M. to the hospital because of what he had done to her. Defendant was very upset by this accusation.
Later that day, around 6:00 p.m., Sergeant Larry Brown, Jr. accompanied by three officers from his unit, two investigators from the prosecutor's office, and two other uniformed police officers, went to defendant's apartment with a warrant for defendant's arrest. Defendant would not answer his door, so the officers kicked it in. Defendant tried to flee and then offered resistance before being tackled. He was taken to police headquarters and processed.
Later that same day, March 11, 2004, S.M. told E.F. and R.W. that defendant had not abused her. R.W. reported this to the prosecutor's office. When Sergeant Genna of the prosecutor's office questioned S.M. about her recantation, S.M. said that she had lied to E.F. and R.W. and that her original story of what happened was true. On May 26, 2004, S.M. also told Autumn Gerena, an investigator at the defense attorney's office, that her recantation had been a lie and that her original account of the abuse was the truth. The matter proceeded to trial in early August 2005, and the jury found defendant guilty of the offenses charged.
On appeal, defendant raises the following arguments:
POINT I
THE PROSECUTOR'S COMMENTS IN HER OPENING AND SUMMATION WENT SO FAR BEYOND THE BOUNDS OF FAIRNESS AND PROPRIETY THAT DEFENDANT WAS THEREBY DEPRIVED OF HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL. (Partially Raised Below).
POINT II
THE COURT ERRED IN ITS RULING REQUIRING THE DEFENSE TO TURN OVER AS DISCOVERY THE DEFENSE INVESTIGATOR'S NOTES OF HER PRIOR INTERVIEW WITH [S.M.], AND DEFENDANT WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL AS A RESULT.

*850 POINT III

THE PROSECUTOR COMPOUNDED THE ERROR OF INTRODUCING THE DEFENSE INVESTIGATOR'S TESTIMONY BY ASKING HER ON REDIRECT EXAMINATION WHY SHE HAD NOT WRITTEN A REPORT REGARDING HER INTERVIEW.
POINT IV
THE TRIAL WAS IRREPARABLY TAINTED WHEN THE PROSECUTOR, HAVING BEEN EXPLICITLY WARNED BY THE COURT THAT GERENA'S TESTIMONY WAS ADMITTED ONLY FOR THE PURPOSE OF NEUTRALIZATION, NONETHELESS REFERRED TO IT TWICE IN HER SUMMATION AS IF IT WERE SUBSTANTIVE EVIDENCE. (Not Raised Below).
POINT V
THE 19-YEAR NO EARLY RELEASE ACT SENTENCE IMPOSED ON DEFENDANT WAS MANIFESTLY EXCESSIVE UNDER ALL OF THE APPLICABLE CIRCUMSTANCES. THE SENTENCE SHOULD BE VACATED AND A 15-YEAR TERM IMPOSED IN ITS STEAD.
While we find no merit to defendant's arguments in Points I and V, we agree that the errors alleged in Points II, III and IV had the capacity, in combination, to affect the outcome of the trial and to deprive defendant of a fair trial.
Defendant alleges prosecutorial misconduct in the prosecutor's remarks during the opening and summation. Specifically, defendant contends that the prosecutor used inflammatory and highly emotional remarks in her opening statements such as:
Now, seven year old [S.M.], who is entering the second grade, will have to come in here and do what no child should ever have to do. She will have to sit up in that witness box and tell you herself the things that Junior did to her.
...
What this case is about simply is how Sidney Atkins molested six year old [S.M.] in her bedroom ... [i]t is about how he stole her innocence. Please do not lose sight of that.
Defendant contends the prosecutor interjected in her summation, her own opinion, in the capacity of an expert witness, regarding the lack of defendant's DNA on the victim as follows:
[S.M.] herself told you nothing came out of his pee-pee. There would be no DNA if nothing came out of his pee-pee, first of all. The second thing we need to pay attention to is what I mentioned in my opening. The first thing we tell a woman not to do when she is raped is shower. Don't wash because the evidence will be washed away. Where is [S.M.] when she discloses this to [E.F.] when this happened? She's in the bathtub.
In reviewing the record for misconduct, "an appellate court `must take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties when they occurred.'" State v. Frost, 158 N.J. 76, 83, 727 A.2d 1 (1999) (quoting State v. Marshall, 123 N.J. 1, 153, 586 A.2d 85 (1991)). A prosecutor is given "considerable leeway in summing up the State's case." State v. Williams, 113 N.J. 393, 447, 550 A.2d 1172 (1988). Prosecutors may use remarks in their summation that graphically and forcefully support their argument. State v. Johnson, 287 N.J.Super. 247, 265, 670 A.2d 1100 (App.Div.1996). The factors to be considered by the reviewing panel in alleged prosecutorial misconduct *851 include: "`whether defense counsel made a timely and proper objection, whether the remark was withdrawn promptly, and whether the court gave the jury a curative instruction.'" State v. W.L., Sr., 292 N.J.Super. 100, 110, 678 A.2d 312 (App.Div.1996) (quoting State v. Zola, 112 N.J. 384, 426, 548 A.2d 1022 (1988)).
Here, a thorough review of the record containing the comments made by the prosecutor in her opening remarks show the comments did not rise to the level of being inflammatory, nor were they of a "call to arms" variety. Furthermore, defense did not object to the remarks made by the prosecutor in her summation concerning the lack of DNA. Generally, if the defense does not object to the alleged improper remarks, those remarks will not be considered prejudicial. Id. at 83-84, 727 A.2d 1 (internal citations omitted). In fact, the failure to object suggests that at the time defense counsel did not believe the remarks were prejudicial and the failure to object also deprives the court of an opportunity to take curative action. State v. Bauman, 298 N.J.Super. 176, 207, 689 A.2d 173 (App.Div.), certif. denied, 150 N.J. 25, 695 A.2d 668 (1997). Moreover, "[p]rosecutorial misconduct is not ground for reversal of a criminal conviction unless the conduct was so egregious that it deprived defendant of a fair trial." W.L., Sr., supra, 292 N.J.Super. at 110, 678 A.2d 312 (quoting State v. Ramseur, 106 N.J. 123, 322, 524 A.2d 188 (1987)).
Defendant's contention that the prosecutor offered her own testimony as that of an expert during summation is inaccurate. The prosecutor did not depart from the facts and evidence proffered or the reasonable inferences that could be drawn therefrom, i.e., that exposure to soap and water might have an effect on diluting or removing a substance. Such logic is certainly within the ken of the average juror. The prosecutor's comments were harmless, and the trial judge committed no error in allowing them.
Next, we turn to defendant's contention that the trial court erred by requiring the defense counsel to turn over the defense investigator's notes from an interview she had with S.M. on May 26, 2004. The notes included statements by the victim consistent with her accusation that defendant had molested her. Defendant alleges the notes were privileged and that the order to disclose them undermined the effective assistance of counsel because it tends to chill investigatory efforts. In addition, defendant complains that the prosecution made improper insinuations in front of the jury that the defense had tried to "hide" information uncovered by the investigator. Defendant further asserts that the prosecutor improperly used the testimony of the defense investigator as if it were substantive evidence in her summation remarks. We agree.
Here, the defense investigator, Autumn Gerena, went to the E.F. home and interviewed S.M. S.M. told Gerena an account of the events with defendant on March 10, 2004, consistent with what she had told the police. This was deemed relevant to the prosecution's case as evidence was proffered that S.M. had subsequently recanted to two relatives, E.F. and R.W. At trial, the court granted the State's request to order the defense to turn over the notes Gerena had taken during her interview of S.M. The trial judge reasoned that the order was justified by N.J.R.E. 607 and N.J.R.E. 803(a)(1) to show prior consistent statements to rebut a recent fabrication. The judge conditioned his order by ruling that S.M.'s statement to the investigator would only be relevant to the second recantation and not the first, as that one predated the statements. Prior to the *852 judge granting the State's request, the defense presented testimony from E.F. that S.M. had recanted her allegations the day after the incident and again two weeks before trial, and from R.W. who likewise testified S.M. recanted her story the day after the incident. R.W. also testified that the child had a reputation for being untruthful.
N.J.R.E. 607 provides:
[F]or the purpose of impairing or supporting the credibility of a witness, any party including the party calling the witness may examine the witness and introduce extrinsic evidence relevant to the issue of credibility ... [a] prior consistent statement shall not be admitted to support the credibility of a witness except to rebut an express or implied charge against the witness of recent fabrication or of improper influence or motive....
The rule makes clear that a party may introduce extrinsic evidence where it is relevant to credibility, and the trial judge relied on this rule.
Defendant nevertheless argues that State v. Spencer, 319 N.J.Super. 284, 725 A.2d 106 (App.Div.1999) supports his contention that turning over the defense investigator's notes should not have been required because defendant did not intend to call the investigator as a witness, nor to use her notes at trial. Spencer is distinguishable in that the expert who prepared the report in that case was not called as a witness by either party. Ibid. There, we held that the defendant's right to confront witnesses had been violated because the preparer did not testify, and hence, was not available for cross-examination. Here, the preparer was called by the adverse party to testify over defendant's objection.
The United States Supreme Court recognized in United States v. Nobles, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975) that a defendant may waive the right to privileged or confidential information generated by a defense witness. There, the "defense counsel intended to call his investigator as a witness for the purpose of impeaching several prosecution witnesses, yet resisted discovery of the investigator's memoranda of interviews with those witnesses." Williams, supra, 80 N.J. at 481, 404 A.2d 34 (explaining Nobles, 422 U.S. at 231-32, 95 S.Ct. at 2166-67, 45 L.Ed.2d at 150). The Nobles court held that the defense could not withhold relevant portions of the investigator's reports because in calling the expert as a witness, the defense in effect waived any privilege not to disclose material "which might otherwise have been available." Id. (quoting Nobles, supra, at 236-40, 95 S.Ct. 2160).
In Williams, supra, 80 N.J. at 481, 404 A.2d 34, our Supreme Court said of Nobles: "It was implicit in [that] court's analysis that the material would not have been discoverable had defense counsel elected not to call the investigator as a witness or utilize his reports in any way at trial. [] This is precisely the position which we endorse today." Ibid. (emphasis added; citation omitted).
The State relies on Rule 3:13-3 to support its claim that it was entitled to the defense investigator's notes. However, in State v. Mingo, 77 N.J. 576, 392 A.2d 590 (1978), the Court explicitly held that Rule 3:13-3 does not require discovery of a defense-retained expert consultant's reports or other prepared materials, if the defense does not intend to use it at trial. Id. at 587, 392 A.2d 590. Thereafter, Williams expanded "expert" to include "defense material of any other nature." Williams, 80 supra, N.J. at 480-81, 404 A.2d 34.
*853 The Court's discussion of the issue in Mingo is instructive for this case. The Court explained:
[W]ith respect to the adverse testimonial use of a defense expert's opinion, the situation differs. As noted, by signifying an intention to use the expert as a trial witness, the defense waives the confidentiality which otherwise attaches to the reports to which his contemplated testimony will relate. Those reports are thus rendered discoverable by the State. However, the defense does not waive its right to control the testimonial use of the expert-he remains unavailable to the State as a witness. The right to confidentiality we have recognized not only places limitations on prosecutorial discovery but also affords an evidentiary privilege. If the expert actually testifies for the defense concerning the substance of the reports he has rendered to defense counsel, the State remains able to effectively cross-examine him with respect thereto by reason of the discovery it has been granted. However, should the defense elect not to present the expert as a witness after previously indicating to the contrary, the fact that his otherwise confidential reports have been disclosed to the prosecution does not entitle the State to call the expert as its witness over objection by the defense. The testimony of a defense consultant concerning the substance of expert services he has performed for the defense is exclusively available to the defense. If the defense trial strategy results in his not being called to testify, his potential testimony on that subject remains privileged from use by the State. We accordingly hold that the report and testimony of a defense-retained expert consultant who will not testify as a defense witness and whose report will not be utilized as evidence are not available to the State. This rule will safeguard the internal strategic processes of the defense. The protection such a rule affords will enhance the ability of the defense attorney to provide effective representation by affording him the maximum freedom to seek the guidance of expert advice in assessing the soundness and advisability of offering a particular defense without the fear that any unfavorable material so obtained can be used against his client. A defense attorney should be completely free and unfettered in making a decision as fundamental as that concerning the retention of an expert to assist him. Reliance upon the confidentiality of an expert's advice itself is a crucial aspect of a defense attorney's ability to consult with and advise his client. If the confidentiality of that advice cannot be anticipated, the attorney might well forego seeking such assistance, to the consequent detriment of his client's cause. The protection from unwarranted disclosure we today mandate is an indispensable element of a criminal defendant's constitutional right to the effective assistance of counsel.

[Mingo, supra, 77 N.J. at 586-87, 392 A.2d 590 (emphasis added).]
Applying the same rationale to the record before us, leads us to find reversible error on the part of the trial court in allowing the prosecution to invade the privilege with regard to the defense-retained consultant. The trial court seems to find an exception to our case law where none exists. The court remarked: "it is something that you, in fact, did you [sic] because you attacked the recantation." If the justification is that the defense opened the door under N.J.R.E. 607 by introducing S.M.'s recantation, other evidence of prior consistent statements was available to rebut the charge of recent fabrication or *854 of improper influence or motive. We note, for example, the State's own witness, Sergeant Genna of the prosecutor's office, had interviewed S.M. one week prior to the trial, with the prosecutor present.
There was no compelling need on the prosecution's part to turn the defense investigator into a witness against the defendant during trial. In this context, it is obvious that the defense investigator's testimony would be far more prejudicial to defendant than a different State's witness testifying to the identical issue. The use of the defense expert no doubt better suited the "tactical purposes" of the prosecution. By contrast, the State's case would not have been unduly prejudiced by upholding the defense-privilege.
During the redirect examination of the defense-retained investigator, the prosecutor sought to create an impression, not dispelled by the court, that the defense had been caught attempting to conceal information. The prosecutor asked defendant's investigator:
Q: Why didn't you write a report?
A: Cause I wasn't asked to.
Q: You have to be asked to write a report?
Is that what your testimony is?
A: Sometimes, yes.
Q: Who told you not to write a report?
A: It just wasn't asked in the request.
At a minimum, the court should have given a curative instruction that an interviewer is not required to write a report and that no sinister motive should be inferred from the failure of the investigator to have written a report.
Lastly, although the trial judge cautioned the prosecutor that she could use the investigator's testimony solely for neutralization purposes, and not as substantive evidence of the truth of the matter, the prosecutor emphasized the investigator's testimony as corroborating evidence in her summation. For example, counsel stated:
I'm sure you are going to be surprised to have me tell you that [S.M.] was corroborated by some of the defense's own witnesses.[2] She also even told, by the way, the defense investigator that it happened. You remember that testimony. The child was consistent to the defense investigator about what happened. So that's important. Autumn [the investigator] corroborates [S.M.].
Because of the critical importance of evidence bearing upon credibility and the lack of forensic evidence tending to corroborate the alleged sexual assault, we must presume that the result of the trial may have been different if the adverse testimony of the defense-retained investigator had not been allowed. In considering whether the State's use of the defense-retained investigator may have been harmless error, however, the prosecutor's emphasis on that testimony in her closing argument highlights the capacity of that evidence to shift the balance and it persuades us that there is prejudice inherent in the source of that evidence.
Defendant argues that the trial court erred by imposing a sentence in the upper limit of the statutory range for aggravated sexual assault. However, in light of our determination to reverse the conviction and to remand the matter for a new trial, we decline to discuss issues raised concerning the sentence.
Reversed and remanded for further proceedings.
NOTES
[1] S.M. and T.M. are the biological children of E.F.'s sister, but have been in E.F.'s care since infancy.
[2] This remark technically would not apply to the defense investigator, but the jury, viewing the circumstances as a whole, would likely regard it as such.