# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1142-17T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

D.C-M.,[1]

     Defendant-Appellant.

_____

Argued December 9, 2019 – Decided January 30, 2020

Before Judges Geiger and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 16-02-0347.

Cody Tyler Mason, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Cody Tyler Mason, of counsel and on the brief).

William Kyle Meighan, Senior Assistant Prosecutor, argued the cause for respondent (Bradley D. Billhimer, Ocean County Prosecutor, attorney; Samuel J.

---

[1] We use fictitious names for the defendant, the victim and certain witnesses to protect the victim's privacy interests. N.J.S.A. 2A:82-46(a); R. 1:38-3(c)(9).

Marzarella, Chief Appellate Attorney, of counsel; William Kyle Meighan, on the brief).

PER CURIAM

Defendant was tried before a jury and found guilty of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a), second-degree sexual assault, N.J.S.A. 2C:14-2(b), and second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1). He appeals from the judgment of conviction and sentence, and raises the following issues:

> POINT I
>
> THE PROSECUTOR COMMITTED REVERSIBLE MISCONDUCT WHEN SHE APPEALED TO THE JURY'S EMOTIONS IN HER OPENING STATEMENT, AND MADE INCULPATORY STATEMENTS UNSUPPORTED BY THE RECORD IN HER SUMMATION.
>
> > A. THE PROSECUTOR COMMITTED MISCONDUCT WHEN SHE ASKED THE JURY TO VIEW THE CASE FROM THE PERSPECTIVE OF A MOTHER WHOSE CHILD WAS SEXUALLY ABUSED.
> >
> > B. THE PROSECUTOR COMMITTED MISCONDUCT IN SUMMATION WHEN SHE MADE UNSUPPORTED COMMENTS TO INCULPATE DEFENDANT.
>
> POINT II

2

THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT FAILED TO INSTRUCT THE JURY ON HOW TO EVALUATE DEFENDANT'S ALLEGED INCULPATORY OUT-OF-COURT STATEMENT.

POINT III

THE CUMULATIVE EFFECT OF THE TRIAL ERRORS DEPRIVED DEFENDANT OF DUE PROCESS AND A FAIR TRIAL AND WARRANTS REVERSAL OF HIS CONVICTIONS.

POINT IV

A REMAND IS REQUIRED BECAUSE THE COURT IMPOSED $4000 IN [SEX CRIME VICTIM TREATMENT FUND (SCVTF)] PENALTIES WITHOUT EXPLANATION.

After considering these arguments against the record and applicable legal principles, we affirm defendant's conviction but remand for the court to make the necessary factual findings and, if necessary, conduct an ability to pay hearing with respect to the assessed penalties.

I.

On June 19, 2015, at approximately 7:00 a.m., the Lakewood Police Department received a 911 call regarding a sexual assault at a local residence. Detective Melissa Matthews of the Ocean County Prosecutor's Office responded to the home to investigate and learned that the victim was an eight-year-old girl, Y.S.M. (Yvette). Matthews interviewed Yvette's mother, C.M.T. (Claudia) and

Yvette's cousin, A.S.C. (Anne).  Yvette and Claudia lived in a home with Claudia's two sons, Yvette's brothers, and her boyfriend, defendant D.C-M. (Donald).  Donald is not the biological father of the children.  Anne lived with her child, husband, and mother-in-law in an adjoining apartment.

Anne, who placed the 911 call, testified that she "heard some noise" that morning in Claudia's home.  Specifically, she recalled hearing Yvette saying "no" three times.  Anne feared that Yvette was "going through something horrible," had a "bad premonition," and was concerned someone was "forcing" Yvette to do something against her will.  Anne opened the door connecting the residences and testified she witnessed Donald on a couch with a blue blanket on his lap and Yvette down "on her knees" with her mouth "on his penis."  Anne further testified that Donald looked directly at her and then ran into the bathroom with his erect penis exposed.

Anne did not enter the home to remove Yvette.  Instead, she testified that she woke her husband and instructed him to call the police while she went to alert her mother-in-law.  Anne's husband then removed Yvette and brought her to their apartment.

Yvette "was shaking" and repeated that she "didn't do anything."  Anne testified she asked Yvette if this happened before and Yvette responded that it

A-1142-17T4

happened "many times" including in the home where Yvette and her family, including defendant, lived approximately a year and a half earlier. Anne testified that Yvette specifically stated that in the past Donald forced her to touch his penis, he touched her vagina, kissed her, and further assaulted her by performing oral sex on her. Yvette also told Anne that Donald tried to vaginally penetrate her.

Claudia testified that Donald woke her on June 19, 2015 and stated Anne "was crying and that she had taken Yvette to her room." Claudia went downstairs and observed that her two sons were still sleeping. Claudia heard Anne crying and testified that she "could hardly speak." Anne eventually told Claudia that she saw Yvette "doing oral sex" to Donald while on the couch. Claudia testified that she was shocked and could not believe that Donald would abuse Yvette. Claudia began to cry and asked Yvette if Donald had "put his penis in her vagina." Yvette also told Claudia about Donald's sexual abuse and assaults.

Donna Velardi, a forensic nurse with the Ocean County Prosecutor's Office, performed a sexual assault evaluation and testified that she did not see any injuries on Yvette's body, but did detect unspecified cloth fibers on Yvette's skin. She collected multiple swabs including in the area around Yvette's outer

lips. Cortney MacDonald, a New Jersey State Police forensic scientist, analyzed the evidence and testified that she did not detect sperm on the collected swabs.

Matthews also interviewed Anne, Claudia, and one of Yvette's brothers. The recorded interview with Yvette was played for the jury.[2] In her interview, which was largely consistent with her trial testimony, Yvette stated Donald abused her in multiple locations, including on his bedroom floor, and that the abuse started in their prior residence. In one incident, Yvette told Matthews that Donald placed his finger in her vagina. Yvette further testified at trial that, on "more [than two] times," Donald's "mouth went into [her] private part," and that he would "put his mouth on [her] chest . . . and [her] mouth."

Yvette also told Matthews that in the morning of June 19, 2015, Donald forced her to perform oral sex while she was getting ready for school. Yvette stated during the interview and at trial that the incident occurred in a closet under the stairs, not on the couch, and specifically denied being abused on the couch that morning. Yvette also did not corroborate Anne's statement that Donald ran into the bathroom with a blanket and stated she did not have a blue blanket

---

[2] In a January 20, 2017 pretrial decision issued after an evidentiary hearing, the court determined that Yvette's statements to Matthews were admissible under the tender years exception to the hearsay rule, N.J.R.E. 803(c)(27). Donald does not challenge that ruling on appeal.

A-1142-17T4

concealing her head, again contrary to Anne's testimony. Yvette also testified that Anne told her she witnessed Donald putting his penis in her mouth.

After the interviews, Officer Donald Fazio and another officer returned to Claudia's home to inspect the closet where Yvette stated the abuse took place that morning. Fazio testified he photographed the closet area and collected swabs, including of what he thought was "a liquid or a fluid" on a wall.

Fazio stated that he collected the swabs taken by Velardi and a purple tank-top belonging to Yvette that was found on the top of the arm of the couch where Anne allegedly witnessed the assault. Although the swabs did not detect sperm or saliva, MacDonald testified that Yvette's DNA was on the tank-top and there was a "fairly high" chance that Donald's DNA was also on it.

MacDonald explained that since she initially detected only Yvette's DNA on the tank-top, she performed additional YSTR testing that "hones in on the Y chromosome which only males have." She confirmed that a "mixed YSTR DNA profile was obtained [from the tank-top]" that matched the YSTR DNA profile from a specimen provided by defendant. MacDonald noted that the YSTR DNA profile she obtained from the tank-top occurred no more frequently than one in 3180 African Americans, one in 3630 Caucasians, and one in 2120 of the Hispanic population. She determined, however, that "all [Donald's] paternal

7

male relatives cannot be excluded" due to the paternal inheritance characteristic of the DNA test performed. No other males related to Donald lived in the residence.

Donald also testified at trial. He specifically denied Yvette's and Anne's allegations. He stated that both Yvette and one of her brothers was awake when he was downstairs and that he was simply sitting on the couch when Anne opened and closed the door and asked Yvette to come to her apartment. He further testified that "[his] penis never went out of [his] pants." Moreover, he stated that he went into the bathroom to brush his teeth and did not see Anne. Donald acknowledged, however, that Anne, her husband, and her mother-in-law were in his apartment when he left the bathroom, and Anne "was crying" and holding Yvette "by her arm." Donald also testified that no one would tell him what was happening, but that Yvette refused to leave with Anne until he promised to get Claudia.

Donald cooperated with the police and was interviewed on two separate occasions during which he allegedly made inculpatory statements. The court denied Donald's motion to suppress his statements after an evidentiary hearing and concluded that "the requirements of the Fifth Amendment and the warnings

identified as <u>Miranda</u>[3] [r]ights were sufficiently met here." Donald does not challenge that ruling on appeal.

At trial, Donald denied the charges and stated he never touched Yvette inappropriately. He also specifically denied, on cross-examination, that he told the police in the aforementioned statement that Yvette may have accidentally touched his penis on June 19, 2015.

After initially indicating they were deadlocked, the jury convicted defendant on the remaining charges in the indictment.[4] This appeal followed.

## II.

In his first point, defendant maintains that the prosecutor went "beyond the bounds of fair play," when she asked the jury during opening statements "to view the case from the perspective of a parent whose child was abused," and "made unsupported inculpatory statements in her summation." According to defendant, these statements violated defendant's rights to a fair trial and due process and warrant reversal of his convictions. We disagree.

---

[3] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

[4] Prior to the jury's verdict the State dismissed one of the two first-degree aggravated sexual assault counts.

Specifically, defendant points to the following statements by the prosecutor made during opening statements:

> What do you do if you find out that someone is touching your child? What do you do if you learn that someone is touching your daughter on her vagina, inside of her vagina? What do you do if you find out that a man is having your daughter touch his penis? What do you do if your daughter is eight years old, and it's this man who is doing it? What do you do if this is the man who is your live-in boyfriend who lives in the house with yourself and your three young children?
>
> These are the questions that [Claudia] had to ask herself of June 19th of 2015 when she learned for months [defendant] had been sexually assaulting her daughter.

At no point during the opening statements did counsel object. Later that day, during the redirect testimony of Anne, the court, <u>sua</u> <u>sponte</u>, advised the prosecutor:

> I . . . want to caution the State, at no time going forward are you to suggest to the jury to put yourselves in the mother's position in judging the defendant's guilt . . . . I have considered giving a curative instruction [but] decided against it because [defense counsel] didn't object and because I don't want to draw more attention to it . . . . So I'm just advising you going forward and in terms of your summation not to do that.

Despite the court's comments, counsel for defendant neither requested a mistrial, a curative instruction, nor objected to the court's ruling.

A-1142-17T4

At the close of the State's case, however, defendant's counsel, relying on State v. W.L., 292 N.J. Super. 100 (App. Div. 1996), objected to the prosecutor's opening statement. The court replayed the relevant opening statement and denied defense counsel's belated request, relying on State v. Gorthy, 226 N.J. 516 (2016). It concluded the prosecutor was not "actually diverting [the jury] from considering the evidence, but really telling them that the evidence will show all of this. And it's really up to them to decide whether or not that evidence has been produced in this trial."

The court also noted that while the prosecutor "should not have had the jury more or less put themselves in the mother's position or to have sympathized with the mother[,] . . . [s]he said this after the [c]ourt has told this jury twice . . . that whatever the attorneys say is not evidence" and specifically referred to "their openings and their summations." Finally, the court reasoned:

> I do not believe [the prosecutor's comments were] said purposely to inflame the jury to sympathize with the victim's family. I think it was more to set the stage, if you will. She was trying to be a bit dramatic perhaps to get their attention, but I don't think it was done intentionally to inflame the jury and I think that also came across.

We initially note that as the trial court correctly advised the jury, opening statements and summations of counsel are not evidence. State v.

Timmendequas, 161 N.J. 515, 578 (1999). The purpose of opening statements is to better prepare the jury to understand the evidence, and such statements are limited to the facts that counsel intends to prove. State v. Wakefield, 190 N.J. 397, 442 (2007).

Further, it is well-settled that prosecutors "are afforded considerable leeway in making opening statements." State v. Williams, 113 N.J. 393, 447 (1988). The prosecutor is, however, "limited to commenting upon the evidence and the reasonable inferences which may be drawn from that evidence." State v. Setzer, 268 N.J. Super. 553, 565 (App. Div. 1993). "A prosecutor's opening statement 'should provide an outline or roadmap of the State's case' and 'should be limited to a general recital of what the State expects, in good faith, to prove by competent evidence.'" State v. Land, 435 N.J. Super. 249, 269 (App. Div. 2014) (quoting State v. Walden, 370 N.J. Super. 549, 588 (App. Div. 2004)).

"[T]o justify reversal, the [prosecutor's remark] must have been so egregious that it deprived the defendant of a fair trial." Wakefield, 190 N.J. at 438 (2007) (citation omitted). The reviewing court should consider "whether defense counsel made a timely and proper objection, whether the remark was withdrawn promptly, and whether the court ordered the remarks stricken from the record and instructed the jury to disregard them." Ibid. (citation omitted).

When, a defendant fails to object to the prosecutor's comments, the allegedly "improper remarks . . . will not be deemed prejudicial." Timmendequas, 161 N.J. at 576.

We find W.L., relied upon by defendant in the trial court and before us, distinguishable. In W.L., also a child sexual assault case, we reversed, in part based on the prosecutor's "flagrant appeal for sympathy for the victim and an equally flagrant attack on the defendant's character and credibility" in his opening statement, and on his "continued . . . appeals for sympathy and hate" during his summation. 292 N.J. Super. at 105-11. In that case, the prosecutor commented on the innocence of all children generally, the effects of the crime on the victim's family, and advised the jury that if it found the State has proven its case it had a "strong duty to find him guilty." Id. at 105-09. The prosecutor also stated without offering supporting evidence that the father urged the son to pour roach spray down his mother's mouth when sleeping and to stab out the eyes of his cousins when visiting. Id. at 107-08. The prosecutor's comments here bear no similarity to the repeated and pervasive misconduct that occurred in W.L.[5]

---

[5] In this regard, we note that defense counsel acknowledged when discussing W.L. that in that case the "prosecutor's opening statement almost entirely was a

We conclude that when viewed in the context of the entire trial proceedings which involved the testimony of nine witnesses, including the defendant and the victim, the aforementioned remarks, while improper and gratuitous, were not clearly capable of producing an unjust result or so egregious that it deprived defendant of a fair trial. State v. Frost, 158 N.J. 76, 83 (1999). In reaching this conclusion we considered that defense counsel failed to make a timely objection and the prosecutor did not repeat the comments at any subsequent point, including summations. Further, we note that the State did introduce testimonial evidence that established Donald's abuse of Yvette, as referenced in the opening statement.

In addition, as noted, prior to opening statements and following closing arguments, the court instructed the jury that counsel's statements were not evidence. It explained that evidence came from witnesses and documents or tangible items admitted into evidence at trial. Specifically, the judge stated:

> The first order of business will be the prosecutor's opening statement. In the opening statement, the prosecutor will present the State's contention and will outline what she expects to prove. Following that, the defense counsel will make her opening statement. What is said in an opening statement is not evidence. The evidence will come from the witnesses who will

flagrant appeal for sympathy," and that she was not "indicating that that's what happened" during the prosecutor's opening statement here.

testify and from whatever documents or tangible items that are received into evidence.

The judge repeated a similar instruction before the jury deliberated. Additionally, the jury received detailed instructions regarding the elements of the crimes charged, including the mens rea required to prove them. It is presumed the jurors followed these instructions. State v. Loftin, 146 N.J. 295, 390 (1996). Thus, the jury was clearly informed as to the distinction between evidence and argument. Finally, the State introduced considerable and significant evidence supporting defendant's guilt that included not only the videotaped and live testimony of Yvette, but testimony from Anne and Claudia. In addition, the jury was presented with DNA evidence upon which it could conclude both the victim's and defendant's saliva was found on the inside portion of Yvette's clothing. Under the circumstances, we conclude the prosecutor's remarks did not constitute reversible error.

Defendant also contends the prosecutor made improper comments in his summation. Specifically, he argues that the prosecutor committed misconduct when she represented that Claudia testified that defendant "put towels on a railing to conceal his abuse" and that Yvette testified that defendant "did not abuse her on the couch only because [Anne] entered the apartment."

As to the claim that the prosecutor misrepresented Claudia's testimony, the prosecutor stated:

> Now, we know that there's things on the railing here. [Claudia] testified that [the defendant] put some of these towels here blocking the view of the closet so nobody could see they were in here, behind there. Upstairs, [Claudia] sleeps here. She testified that [defendant] put these things on the railing, [defendant] put this blanket, and my recollection is she testified on the railing here, to block the view so that [Claudia] can't see . . . .

Prosecutors are entitled to wide latitude in summations provided their comments are based on the facts of the case or reasonably inferred from the evidence. Wakefield, 190 N.J. at 457; Frost, 158 N.J. at 82. They may not make "inflammatory and highly emotional" appeals that can divert a jury from a fair consideration of the evidence. State v. Marshall, 123 N.J. 1, 161 (1991). They also may not cast unjustified aspersions on a defendant or defense counsel, demean the credibility of a defense witness, or make inaccurate factual or legal assertions. State v. Smith, 167 N.J. 158, 177-78 (2001); Frost, 158 N.J. at 85-86.

An appellate court's task is "to consider the 'fair import' of the State's summation in its entirety." State v. Jackson, 211 N.J. 394, 409 (2012) (quoting Wakefield, 190 N.J. at 457). When reviewing a prosecutor's summation, we

consider "the context in which the challenged portions were made, including determining whether the remarks were a measured response to defendant's summation made in an attempt to 'right the scale.'" State v. Murray, 338 N.J. Super. 80, 88 (App. Div. 2001) (quoting State v. Engel, 249 N.J. Super. 336, 379 (App. Div. 1991)). As with challenges to a prosecutor's comments in opening statements, to warrant reversal, the misconduct must be "so egregious that it deprived the defendant of a fair trial." Jackson, 211 N.J. at 409 (quoting Frost, 158 N.J. at 83).

At trial, the State introduced into evidence a photograph showing clothing and towels draped on the railing of the stairs in the apartment defendant shared with Claudia, Yvette, and her brothers. Claudia testified that there was a hook on the bathroom door to hang towels and she did not place any of the shirts or towels on the railing, but that Donald "put everything there."

Defense counsel objected to the prosecutor's closing remarks and stated Claudia did not specifically ascribe a motive to Donald regarding the placement of clothes on the railing. The court overruled counsel's objection and stated "it [was] a fair inference" that Donald placed the clothing on the railing to block Claudia's view.

We agree with the trial court that the prosecutor's comments were based on the reasonable inferences drawn from the evidence at trial and, therefore, were not grounds for reversal. See State v. Morton, 155 N.J. 383, 457-58 (1998). And, while the prosecutor's comments could have been clearer, she did qualify her comments by stating her comments were based on her "recollection." Finally, as noted, the court's charge to the jury clearly stated that counsels' arguments were not evidence and it was their recollection of the evidence that controlled.

Defendant next argues that the prosecutor improperly argued that the reason Yvette stated she was not abused on the couch was due to Anne abruptly interrupting Donald when she opened the door. On this issue, the prosecutor argued:

> We know that on June 19th of 2015, [Yvette] got up and by her testimony and her statement that you saw, the defendant woke her up and put her in the closet area. And at that point he took out his penis and he put it in her mouth. She told you that when she testified and she told you that in her forensic statement. And she described it for you, but she also said something interesting in the fact that she said nothing came out of his penis. And when the officers tested the wall and found nothing it's because he didn't ejaculate in that closet that morning and [Yvette] told you that.
>
> And I submit to you that after that happened, because he didn't ejaculate, he wasn't finished. That's why he

had her on that floor, that's why he was sitting on this couch with this blue blanket over his lap and his penis still out of his pants, because the act was still continuing. And I submit to you that this blanket is here and you heard the testimony from the forensic . . . nurse that she noticed fibers, she saw it in the pictures, and you'll have the pictures in evidence, and she noted fibers. She couldn't tell whether it was clothing or a blanket, and I submit to you that the fair inference from this evidence is that [Yvette] was under this blanket, under this fuzzy blue blanket.

And [Yvette] was very clear to say in her forensic interview that it didn't happen while he was on the couch because he hadn't had a chance to again put his penis in her mouth because [Anne] opened the door. And when he saw her, he was looking up because we know [Claudia's] room is up top, and she startled him, he got up and he ran to the bathroom. And that's when [Anne] saw his erect penis out of his pants. This is corroborated by the fact that here is the couch, here is this blue blanket, [Anne] testifies that when she opens the door and sees him, he's looking up.

As the prosecutor correctly noted, during Yvette's forensic interview, Yvette testified that Donald sexually assaulted her on June 19 by forcing her to engage in oral sex with him in the closet. She also stated that she was not assaulted on the couch that morning but that it occurred "[o]nly in the closet" and that "white stuff" did not come out of Donald's penis. The prosecutor's recitation of this evidence, repeatedly embedded with the phrase "I submit to you," suggesting the abuse was a continuing act was fair argument to explain

A-1142-17T4

Yvette's testimony regarding the purported lack of abuse on the couch considering Anne's specific testimony and Donald's denials. In this context, and noting counsel's failure to object to the summation on this point, we conclude the prosecutor's summation does not warrant reversal of defendant's convictions.

In sum, our review of the prosecutor's summation here establishes that the vast majority of counsel's argument properly dealt with examining and discussing the evidence presented at trial and drawing inferences and conclusions from that evidence. Defendant challenges only a small portion of the State's lengthy summation. Under these circumstances, the comments were not so egregious as to deprive defendant of a fair trial. The prosecutor's statements were a small part of a detailed summation that was substantially focused on a fair review of the evidence.

## III.

Defendant next argues that the court committed plain error when it failed to provide a charge or "guiding instructions" to the jury to assist them in evaluating a prior statement defendant allegedly made that "his exposed penis may have touched [Yvette] on the morning of June 19." Defendant maintains that the trial court should have sua sponte provided the jury with limiting instructions consistent with State v. Hampton, 61 N.J. 250, 271-72 (1972), and

<u>State v. Kociolek</u>, 23 N.J. 400, 421 (1957). Because defendant did not request such instructions or otherwise object to the jury charge pursuant to <u>Rule</u> 1:7-2, we consider this argument under the plain error standard and disregard any error or omission by the trial court "unless it is of such a nature as to have been clearly capable of producing an unjust result." <u>R.</u> 2:10-2; <u>see also</u> <u>State v. Hock</u>, 54 N.J. 526, 538 (1969) (noting the "legal impropriety in the charge" must be "sufficiently grievous . . . to convince the court that of itself the error possessed a clear capacity to bring about an unjust result").

On direct examination, Donald testified that he "never touched [Yvette] at any time." During cross-examination, however, the State asked Donald whether he previously told investigators one of his body parts "brushed up past [Yvette]." Donald responded that he was "talking about [his] arm" and emphasized that he "never mentioned that [his] penis was out or that [he] had touched [Yvette] sexually."[6] After the State reminded defendant he told investigators, in reference to his penis, that "when she jumped . . . that's when she grabbed it" and that "it just got out of there and she grabbed it," defendant

---

[6] The parties have not included a copy of the transcript of Donald's statements to the investigators and which were subject of his motion to suppress. We reference the portion of the statement at issue as characterized during the course of Donald's trial testimony.

repeated that he never said his penis touched Yvette and explained that he was "showing [his] arm and explaining to [investigators] about [his] arm."

On redirect, defense counsel asked defendant whether the prior statement referenced by the State was "an incorrect translation" of what he told investigators. Defendant replied that it was "the detective that was mentioning [his] penis out of [his] pants" and reiterated that "[n]ever did [he] say that [his] penis was outside [of his pants]."[7]

A trial court should provide a <u>Kociolek</u> charge whenever a witness at trial testifies regarding oral statements made by a defendant. <u>Kociolek</u>, 23 N.J. at 421. In such cases, the trial judge should provide the jury with an instruction that it "'should receive, weigh and consider such evidence with caution,' in view of the generally recognized risk of inaccuracy and error in communication and recollection of verbal utterances and misconstruction by the hearer." <u>Ibid.</u> "[T]he <u>Kociolek</u> charge should be given whether requested or not." <u>State v. Jordan</u>, 147 N.J. 409, 428 (1997).

---

[7] After Donald was questioned on redirect, the court denied the State's request at sidebar to present evidence that the transcript of Donald's statements to investigators was a certified translation. Defense counsel, nevertheless, argued in summation that there was "no testimony that he agreed what was translated was true." Defendant did not move to suppress his statement with the trial court on the basis it was improperly translated, nor does he support such a claim on appeal.

In addition, a trial court should provide a <u>Hampton</u> charge "whenever a defendant's oral or written statements, admissions, or confessions are introduced in evidence" regardless of whether the charge is requested. <u>Jordan</u>, 147 N.J. at 425. A jury "shall be instructed that they should decide whether . . . the defendant's [statement] is true[,]" and if they conclude that it is "not true, then they must . . . disregard it for purposes of discharging their function as fact finders on the ultimate issue of guilt or innocence." <u>Hampton</u>, 61 N.J. at 272.

The failure to give the charges, however, is not always reversible error. <u>Jordan</u>, 147 N.J. at 425, 428. We will only reverse when omission of the charges was clearly capable of producing an unjust result in the context of the entire case. <u>Id.</u> at 425, 429. If the statements were "unnecessary to prove [the] defendant's guilt because there is other evidence that clearly establishes guilt, or if the defendant has acknowledged the truth of his statement, the failure to give a <u>Hampton</u> charge" will not require reversal. <u>Id.</u> at 425-26. Likewise, whether the failure to give the <u>Kociolek</u> charge constitutes plain error "will depend on the facts of each case." <u>Id.</u> at 428.

In <u>State v. Harris</u>, 156 N.J. 122, 183 (1998), the Supreme Court found that a failure to give a <u>Hampton</u> and <u>Kociolek</u> instruction was not plain error because the cross-examination of the testifying witness was sufficient to test his

credibility before the jury. The Court explained that "[t]he principal value of the Kociolek charge is to cast a skeptical eye on the sources of inculpatory statements attributed to a defendant[,]" and opposing counsel's "devastating cross-examination . . . accomplished that end." Ibid.

The Court reached a similar conclusion in State v. Feaster, 156 N.J. 1, 72 (1998), finding that "[t]he very purpose of a Hampton charge is to call the jury's attention to the possible unreliability of the alleged statements made by a criminal defendant." Because the witness was "under a sustained attack during which his credibility was thoroughly challenged" on cross examination, the failure to give a Hampton instruction was not plain error. Ibid.

Initially we note that unlike in Hampton, the State did not move Donald's statement into evidence. Even were we to assume that a Hampton charge was nevertheless required under the circumstances here where the State effectively introduced the substance of the inculpatory statement during cross-examination, we conclude the court did not commit plain error in failing to provide either a Hampton or Kociolek instruction for at least three reasons.

First, the court gave detailed instructions on assessing the general credibility of witnesses. See Model Jury Charges (Criminal), "Criminal Final Charge" (May 12, 2018). Second, Donald testified and was directly and cross-

examined regarding his statement, permitting the jury to assess his credibility regarding the statement. Third, there was significant other evidence that clearly established defendant's guilt. That testimony included Yvette's forensic interview, her trial testimony recounting in detail the extensive and repeated acts of sexual abuse by Donald at multiple locations, the DNA evidence and related testimony, and the testimonies of Claudia and Anne, which the jury was free to accept or reject in whole or in part. Accordingly, we conclude the court's failure to provide a Hampton/Kociolek charge, under the particular and unique facts of this case and given the lack of any request, does not require reversal.

IV.

Defendant argues in his third point that if we determine each alleged error is insufficient to warrant reversal, the cumulative effect of each error nevertheless denied defendant a fair trial. "[E]ven when an individual error or series of errors does not rise to reversible error, when considered in combination, their cumulative effect can cast sufficient doubt on a verdict to require reversal." State v. Jenewicz, 193 N.J. 440, 473 (2008). As we have discussed, defendant has not demonstrated any prejudicial error occurred at trial and the principle of cumulative error, therefore, has no application here. See State v. Weaver, 219 N.J. 131, 155 (2014) ("If a defendant alleges multiple trial errors, the theory of

cumulative error will still not apply where no error was prejudicial and the trial was fair.").

V.

Finally, defendant maintains in his fourth point that the court erred in imposing a $4000 SCVTF penalty in accordance with N.J.S.A. 2C:14-10 and a remand is necessary because the court failed to "hold a hearing or make any findings about those penalties or [defendant's] ability to pay them" as required by State v. Bolvito, 217 N.J. 221 (2014). Defendant does not challenge any other provision of his sentence. The State opposes a remand but alternatively submits that any remand be limited to the court "provid[ing] its reasons for the $4,000 SCVTF penalty."

A sentencing court may impose an SCVTF penalty against a defendant in any amount "between a nominal figure and the upper limit prescribed by N.J.S.A. 2C:14-10(a) for the degree of the offense at issue." Bolvito, 217 N.J. at 233. In making that determination, a sentencing court "should begin by considering the nature of the offense." Ibid. Moreover, courts "should consider the defendant's ability to pay the amount assessed." Id. at 234. "If a substantial penalty is assessed against a defendant who has no realistic prospect of satisfying it, that penalty is destined to become an unsatisfied judgment . . . ."

A-1142-17T4

Ibid. In determining "a defendant's ability to pay, the sentencing court should look beyond the defendant's current assets and anticipated income during the period of incarceration." Ibid. Upon sentencing, the "court should provide a statement of reasons when it sets a defendant's SCVTF penalty within the statutory parameters," which "will apprise the parties, the victim, and the public and will facilitate appellate review." Id. at 235.

The court did not supply such a statement of reasons here. We thus vacate only that portion of defendant's judgment of conviction that imposed a $4000 SCVTF penalty and remand for the sentencing court to state the reasons for the imposition of any SCVTF penalty imposed, including within those reasons an assessment of defendant's ability to pay.

Affirmed in part and vacated and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION